714 So.2d 105 (1998)
Ruth Herring NOEL, Plaintiff-Appellant,
v.
DISCUS OIL CORP., et al., Defendants-Appellees.
No. 30561-CA.
Court of Appeal of Louisiana, Second Circuit.
May 13, 1998.
*106 Mark W. Odom, Shreveport, for Plaintiff-Appellant.
Klotz, Simmons & Reeks by David Klotz, Shreveport, for Defendants-Appellees.
Before MARVIN, C.J., and GASKINS and CARAWAY, JJ.
MARVIN, Chief Judge.
In this action for declaratory judgment brought by a mineral lessor, Ruth Herring Noel, to determine whether the 1994 amendment to a 1973 mineral lease conveyed to the mineral lessee, Discus Oil Corporation, an interest in both oil and gas produced from the formation described in the amendment, or restricted the lessee's interest to oil produced from that formation, Mrs. Noel appeals a judgment declining to adopt the more restrictive interpretation of the amendment. She also complains of the trial court's admission of parol evidence to determine the intent of the parties.
We affirm.

PREFACE
The 1973 lease, executed on a Bath's La. Spec. 14-BR1-2A-4 (5-66) form, granted Discus the right to explore for and produce "oil, gas and all other minerals" from the Noel property, without restriction as to mineral formations or zones. The lease for a primary term of three years contained a Pugh clause. This clause provides that production of any minerals after expiration of the primary term maintains the lease only as to "[f]ormations producing from the leased premises or from a unit including leased premises[.]" The Noel property was pooled with other property in the Plain Dealing Field in Bossier Parish by orders of the Department of Conservation in 1977 establishing separate units for oil production (160 acres) and for gas production (640 acres).
During and after the primary term of the lease, wells on the Noel property or on property pooled with it produced either or both oil and gas from various mineral formations. By 1994, only the Pettet Formation continued to produce.
The 1973 lease granted rights to all formations. The 1994 amendment to the lease, prepared by Mrs. Noel's agent, grants Discus rights to one formation, the Hosston Formation. The parties essentially agree that the rights of Discus in the Hosston Formation derive from the amendment. The disputed language in the amendment as to *107 the extent of the interest conveyed is quoted infra.
After the amendment was executed, Discus recompleted an oil well and two gas wells in the Hosston Formation, paying Mrs. Noel the 20 percent royalty called for in the amendment, which Discus construed as having granted rights in both minerals. Mrs. Noel accepted without dispute the royalty payments for the oil production, but asserted that her gas rights in the Hosston Formation were not leased to Discus under the original lease or the amendment. She claimed a 25 percent working interest in the gas production from Discus and the other working interest owners who were named as defendants.
The trial court found that the amendment to the lease, on its face, was ambiguous or fairly susceptible to more than one interpretation regarding the extent of the mineral rights intended to be leased. Over Mrs. Noel's objection, the trial court admitted extrinsic evidence to ascertain the intent of the parties. Resolving the conflicting testimony on that issue in favor of the defendants, the court denied the declaratory relief sought by Mrs. Noel.
On appeal, Mrs. Noel contends the trial court erred in admitting parol evidence, claiming the amendment to the lease is not ambiguous, and that the court's interpretation of the amendment is not supported by the record even if the extrinsic evidence was properly considered.

STANDARD OF REVIEW
The issue whether the amendment to the lease is ambiguous is one of law, reviewable on appeal by our independent examination of the contract. To resolve this issue, we consider only whether the trial court's conclusion is legally correct, without giving any deference to that conclusion. McDuffie v. Riverwood Intern. Corp., 27,292 (La.App. 2d Cir. 8/23/95), 660 So.2d 158; Sanders v. Ashland Oil, Inc., 96-1751 (La.App. 1st Cir. 6/20/97), 696 So.2d 1031, writ denied.
When the trial court is permitted to consider extrinsic evidence as to the intent of the contracting parties and the extrinsic evidence conflicts, the trial court's ruling on intent is reviewed under the manifest error standard. McDuffie, supra; Sanders, supra.

THE 1973 LEASE
The initial lease, executed on December 21, 1973 by Mrs. Noel's predecessors in interest, granted Discus the right to explore for and produce oil, gas and other minerals in the Northwest Quarter of Section 27, Township 23 North, Range 13 West, Bossier Parish. The leased property contained about 160 acres. The primary three-year term of the lease was extended by production in paying quantities from one or more wells located on the Noel property, including the Noel Estate # 1 well which produced oil from the Cotton Valley Formation located more than 8,600 feet below the surface. Mrs. Noel received the stipulated 3/16 royalty on this production.
Wells on other property in the same section apparently produced both oil and gas from the same or other mineral formations, including the Hosston Formation above the Cotton Valley Formation. The nearby property was not initially pooled or unitized with the Noel property, and Mrs. Noel received no royalty payments on the production from these wells until 1977.
In 1977, the Noel property was pooled with other properties in the Plain Dealing Field by various orders of the Department of Conservation for the State of Louisiana. The DOC pooling orders pertinent here are Order No. 996 and Order No. 996-A, both dated April 22, 1977.
Order No. 996 created five 640-acre drilling and production units for gas wells producing from the Hosston Formation, defined in the order as
that gas and condensate bearing zone occurring in the electric log depth interval between 6,597 feet and 8,600 feet subsurface in the O.B. Mobley, Jr.Bolinger No. 1 well located in Section 27, Township 23 North, Range 13 West, Bossier Parish, Louisiana. (Our emphasis.)
Order No. 996-A created 26 160-acre drilling and production units for oil wells producing from the Hosston Formation, defined in the order as *108 that oil bearing zone occurring in the electric log depth interval between 6,597 feet and 8,600 feet subsurface in the O.B. Mobley, Jr.Bolinger No. 1 well located in Section 27, Township 23 North, Range 13 West, Bossier Parish, Louisiana. (Our emphasis.)
After these orders were issued, one or more wells located on property outside the 160-acre oil unit that included the Noel property began producing oil from the Hosston Formation. Mrs. Noel did not receive royalties on that production.
By 1994, some 20 years after the initial lease to Discus was executed, the Noel Estate # 1 well had ceased commercial production of oil from the Cotton Valley Formation. Other oil and gas wells on the Noel property or on property pooled with it had also ceased producing except for the Noel Estate #2 well, which continued to produce oil from the Pettet Formation, maintaining the 1973 lease only as to production from the Pettet Formation as provided in the Pugh clause in the lease.
In April 1994, Wayne Davis, the president of Discus, approached Richard Miller, an oil and gas consultant who managed Mrs. Noel's mineral interests, expressing a desire to recomplete the Noel Estate # 1 well in the Hosston Formation, a shallower formation above the previously productive Cotton Valley Formation. Mrs. Noel verbally agreed to amend the 1973 lease, which had expired as to the Hosston Formation, to allow Discus to conduct the proposed operations in the Hosston Formation, for a $4,000 cash payment and an increase in her lease royalty from 3/16 to 1/5.
At Miller's request, Davis wrote a letter to Miller on April 13,1994, stating:
Confirming our conversation of April 12, 1994, you have agreed that you will accept on behalf of your Noel clients, $25 per acre covering 160 acres in the NW/4 of Section 27, Township 23 North, Range 13 West, Bossier Parish, Louisiana, which will allow us to commence testing of the Hosston Formations [plural], as defined by the Department of Conservation for the Plain Dealing Field, Bossier Parish, Louisiana. It is agreed that we have 90 days from todays [sic] date to commence testing of the Hosston Formation [singular].
Please prepare your formal agreement ... and send it to me....
(Our emphasis and brackets.)
On April 19, 1994, Miller returned to Davis a copy of the letter with Miller's handwritten notation and signature:
Acknowledge receipt of $4,000.00 check in favor of Ruth H. Noel. Amendment permitting Discus to complete in Hosston under your 1973 lease is approved by Mrs. Noel and will be executed and delivered to you this week.
(Our emphasis.)

THE 1994 AMENDMENT
On April 21, 1994, Mrs. Noel executed a document entitled "Amendment to Oil, Gas and Mineral Lease," prepared by Miller, her agent. The amendment states:
[F]or a consideration of [$4,000] cash in hand paid, and by Discus Oil Corporation's agreement to commence or cause to be commenced, on or before April 15, 1994, operations on the O.B. Mobley, Jr. Noel Estate # 1 well, located in the E½ SE¼ NW¼, Section 27, T-23-N, R-13-W, Bossier Parish, La., to effect a completion in the Hosston Formation as defined under Order No. 996-A, dated April 22,1977, of the Commissioner of Conservation of the State of Louisiana, the undersigned by these presents amend[s] that certain Oil, Gas and Mineral lease dated December 21, 1973, executed by NOEL ESTATE, INC. & LA TIDE CO., INC. to DISCUS OIL CORPORATION, recorded [in the] Conveyance Records of Bossier Parish, Louisiana, to cover all depths from 6,597 ft. to 8,600 ft. as defined in the above referenced order No. 996-A. The aforesaid lease is further amended to increase the [3/16] royalty provided for therein to a[1/5] royalty.
The undersigned does by these presents acknowledge and affirm the validity and effectiveness of the subject lease and state that all other terms and provisions remain as originally written.
(Our emphasis and brackets.)
*109 As mentioned, Order No. 996-A, creating 160-acre oil production units in the Hosston Formation of the Plain Dealing Field, defines that formation as "that oil bearing zone occurring in the electric log depth interval between 6,597 feet and 8,600 feet subsurface" in the O.B. Mobley, Jr.Bolinger No. 1 well.
The companion Order No. 996, creating 640-acre gas production units in the Hosston Formation of the Plain Dealing Field, and which is not referred to in the 1994 amendment, defines the Hosston Formation as "that gas and condensate bearing zone" occurring in the same depth interval in the O.B. Mobley, Jr.Bolinger No. 1 well (6,597-8,600 feet).
Both DOC orders define the depths of the Hosston Formation according to its subsurface location in the Mobley-Bolinger No. 1 well. Miller and Davis understood that the precise depth and thickness of the Hosston Formation might vary from one well to another in the Plain Dealing Field.
After the amendment was executed, Discus successfully recompleted the Noel Estate # 1 well in the Hosston Formation as an oil producer, redesignating the well as the Noel Estate #3. The operator of the well paid Mrs. Noel the 1/5 royalty called for in the amendment. Mrs. Noel does not dispute that her rights in this oil production were leased to Discus under the amendment to the lease subject to her royalty interest.
The dispute arose when Discus recompleted two gas wells in the Hosston Formation, the W.H. Hillier # 1 and the Bolinger # 2-Alt. wells on properties pooled in the 640-acre gas unit with, but not on, Mrs. Noel's 160 acres. In February 1995, Miller wrote the operator of these wells demanding payment for Mrs. Noel's "share of the production proceeds ... [from the two] producing gas wells located on the referenced unit." In the letter Miller referred to Louisiana Mineral Code article 137 which pertains to unpaid royalties. See quote, p. 14, infra. The operator paid Mrs. Noel the one-fifth royalty called for in the lease amendment multiplied by the Noel tract's unit participation factor of approximately one-fourth (160 acres/640 acres). Despite depositing these royalty checks, Mrs. Noel now asserts a 25 percent working interest in the production from the 640-acre gas unit.
In her declaratory judgment action brought in May 1996, Mrs. Noel alleged that the 1994 amendment, by referring only to the Noel Estate # 1 well and to the DOC Order No. 996-A defining the Hosston Formation as an "oil bearing zone," simply allowed Discus to recomplete the Noel Estate # 1 well as an oil well in the Hosston Formation. She claimed her gas rights in the Hosston Formation were not subject to any lease because the 1973 lease had terminated as to the Hosston Formation and the 1994 amendment did not refer to DOC Order No. 996, the order creating the 640-acre gas units and defining the Hosston Formation as a "gas and condensate bearing zone."
Discus, on the other hand, while admittedly aware of the two separate orders, asserted that the sole purpose for mentioning one order but not the other in the amendment was to define the approximate depths of the Hosston Formation, which are identical in both orders, and not to restrict the mineral product covered by the amendment. Because this distinction is not explicitly made in the amendment, Discus claimed the amendment was ambiguous with respect to the extent of its rights in the Hosston Formation.
At trial, Discus offered extrinsic evidence of the intent of the parties to support its interpretation of the amendment. Mrs. Noel objected, claiming the amendment was not ambiguous on its face when read together with the original lease and the two DOC orders. She sought to have the trial court interpret the amendment solely on the basis of those documents.
Agreeing that the amendment was susceptible to more than one reasonable interpretation, the trial court overruled Mrs. Noel's objection and admitted parol evidence. Mrs. Noel's first assignment of error complains of that ruling.

AMBIGUITY?
Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous. *110 A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation. La. C.C. art. 1848, formerly Art. 2276; Rudman v. Dupuis, 206 La. 1061, 20 So.2d 363 (1944); Dixie Campers, Inc. v. Vesely Co., 398 So.2d 1087 (La.1981); McDuffie, supra.
These rules apply even when the contract involves rights in immovable property, such as mineral rights. See Rudman, supra; Henry v. Ballard & Cordell Corp., 418 So.2d 1334 (La.1982); Martin Exploration Co. v. Amoco Production Co., 93-0349 (La.App. 1st Cir. 5/20/94), 637 So.2d 1202, writ denied.
Mrs. Noel contends the amendment to the lease cannot be deemed ambiguous because the amendment clearly refers to only one of the two DOC orders pertaining to the Hosston Formation. That observation does not end the inquiry, however. The issue is not whether the contract on its face contains a reference to one order but not the other, but rather whether the parties to the contract intended to include one order and exclude the other, and for what purpose.
As mentioned, Discus maintains that the sole purpose for referring to one order but not the other was to define the depths of the Hosston Formation, which depths are identically defined in both orders. Mrs. Noel, emphasizing that the amendment contains an explicit reference to the depths of the Hosston Formation apart from the reference to the DOC order, contends the construction advanced by Discus would render the contractual reference to the order redundant and unnecessary. She claims the sole purpose for referring to the order was to limit the lessee's interest to the mineral product referred to in the order.
Order No. 996-A is mentioned twice in the amendment, first in the statement of the consideration for the amendment and again in the amending clause:
[F]or a consideration of [$4,000] cash in hand paid, and by Discus Oil Corporation's agreement to commence or cause to be commenced, ... operations on the ... Noel Estate # 1 well, ... to effect a completion in the Hosston Formation as defined under Order No. 996-A ... of the Commissioner of Conservation...
[T]he undersigned ... amend[s] that certain Oil, Gas and Mineral lease dated December 21, 1973, ... to cover all depths from 6,597 ft. to 8,600 ft. as defined in the above referenced order No. 996-A....
(Our emphasis and brackets.)
The amendment further provides that the 1973 lease remains effective and valid, and that "all other terms and provisions remain as originally written." The original lease, of course, is unrestricted as to mineral formations or zones and grants Discus the right to explore for and produce "oil, gas and all other minerals" from the leased property. Our emphasis.
The 1994 amendment is clearly more restrictive than the original lease as to the mineral formations or zones in which mineral rights are granted. The amendment also clearly reflects the intent of the parties to define the depths of the Hosston Formation in the Noel Estate # 1 well, which is not mentioned in Order No. 996-A, in the same manner as those depths were defined in the order for the Bolinger # 1 well. In those respects, the amendment is not ambiguous.
The reference to Order No. 996-A in the amendment, however, is ambiguous as to whether the parties intended the amendment to be more restrictive than was the original lease with respect to the type of mineral product Discus was authorized to explore for and produce from the Hosston Formation. Neither of the references to Order No. 996-A in the amendment explicitly defines or limits the product Discus might find in the Hosston Formation. The lack of an explicit reference to the order for this purpose, combined with the affirmation of the validity of "all other terms and provisions" of the original lease, causes us to agree with the trial court that the written expression of the common intention of the parties with respect to the product to be covered by the amendment is ambiguous, being susceptible to more than one reasonable interpretation.
*111 Moreover, as La. C.C. art.2046 indicates, ambiguity is not present and the contract should be interpreted on its face only "when the words ... are clear and explicit and lead to no absurd consequences." As discussed below, Mrs. Noel's construction of the amendment in view of the uncertain production potential of Discus's obligatory recompletion of the Noel Estate # 1 Well would clearly lead to an absurd result.
The trial court was legally correct in admitting extrinsic evidence to determine the parties' intent. See Rudman, Dixie Campers, McDuffie, all cited supra.

EXTRINSIC EVIDENCE
As mentioned, Davis's letter to Miller of April 13, 1994 confirms their discussions about the proposed lease of rights in the Hosston Formation. In his letter, Davis initially refers to that formation in the plural, later referring to it in the singular:
[The amendment] will allow us to commence testing of the Hosston Formations [plural], as defined by the Department of Conservation for the Plain Dealing Field, Bossier Parish, Louisiana. It is agreed that we have 90 days ... to commence testing of the Hosston Formation [singular].
(Our emphasis and brackets.)
Miller's handwritten reply on the copy of that letter acknowledges receipt of the cash payment and refers to the amendment as "permitting Discus to complete [a test well] in Hosston under your 1973 lease[.]" Our brackets and emphasis.
Davis's letter refers to "the Hosston Formations as defined by the Department of Conservation" but does not mention a particular DOC order or orders. Miller referred to the amendment as allowing Discus to complete "in Hosston under your 1973 lease," which covered oil, gas and other minerals. Miller and Davis knew that the Noel property and the surrounding property in the Plain Dealing Field had been separately unitized for oil production and for gas production, and that wells of both types had been commercially productive.
After the amendment was executed by Mrs. Noel, Miller faxed a copy of it to Davis. On his copy, Davis underlined the language stating Mrs. Noel's agreement to amend the lease to cover all depths "from 6,597 ft. to 8,600 ft. as defined in the above referenced order No. 996-A." In the margin of the copy, Davis wrote by hand, "996A used only to define the depths per phone conversation with Dick Miller." Davis gave this testimony about that conversation:
In my letter that I wrote to him I just said the Hosston, and this [reference to Order No. 996-A in the amendment prepared by Miller] came about. I asked him why he had put 996-A in there. He said because the State of Louisiana had set these depths up as defined in the Bolinger Number One well and that he needed to do that just to define the depths because you know how these formations may go; it may be higher or lower in another well over there[.]
... I accepted his explanation for it only as a matter of identification as defined by Louisiana State Order 996 and 996-A. He used 996-A because he said the depths are identical on both orders.
(Our emphasis and brackets.)
Miller testified to the contrary:
Q. Was there any discussion between you and Mr. Davis that the only reason you put in the reference to Order 996-A was so that you would know at what depths the Hosston Formation appeared?
A. No.
Q. Your testimony is y'all had no discussions
A. No, that's right.
... [I]t's my recollection that Mr. Davis told me that there was a zone in the Noel Number Three [formerly the Noel # 1] that looked oil productive and that he wanted the amendment and to take a new lease to test that zone.... I was very aware that there was a difference in Hosston oil and Hosston gas, and the Noel interest had not participated in Hosston oil ... prior to that time, although there was production from two wells [outside the oil unit that included the Noel property]....

*112 (Our emphasis and brackets.)
On cross-examination, Davis denied having said that the Hosston zone "looked oil productive" in a particular well:
Q. Isn't it true, Mr. Davis, that the initiation of these discussions was that y'all anticipated additional oil production in the Hosston
A. That's not true. He knew it.
Q. And it was not true that there was some oil wells
A. There was oil wells producing [outside the 160-acre oil unit that included the Noel property].... I do not make the conservation
rulings....
Q. And that primarily when you looked at going back into the Hosston Zone that you anticipated oil production?
A. We don't know what we're going to anticipate when you perforate a zone. It's there. It shows indication of being hydrocarbon productive [on the test logs]. No tool yet has been invented that says this shoot this little zone, it's going to be gas, or shoot this one, it's going to be oil. It's just notit's impossible.
(Our emphasis and brackets.)
Miller essentially agreed with Davis on the latter point, saying, "[A]s we know up there in Plain Dealing you're never certain what you're going to get. Mr. Davis may have thought he was going to [get] gas as well as oil." Our emphasis and brackets.
When asked whether he and Davis had "discussed oil production" in the conversation referred to in Davis's letter, Miller testified:
Well, I can't say it was alone but we definitely did discuss oil production in Hosston.
Q. But this letter following up on your discussions in your mind then was it you[r understanding] that he [was] following up on the oilthe intent to develop oil in that zone?
A. Not necessarily because he said the full Hosston formation. Mr. Davis is also experienced in the oil and gas business.
(Our emphasis and brackets.)
The reference to Order No. 996-A, the order establishing the Hosston oil units, first appeared in the amendment prepared by Miller, which was not submitted to Davis for review before it was signed by Mrs. Noel. Both Miller and Davis knew that the companion order, Order No. 996, established separate units for Hosston gas production.
Davis testified, and Miller denied, that Davis immediately questioned Miller about the reason for the 996-A reference when he received a copy of the signed amendment. Having found Miller's verbal representations reliable in more than ten years of business dealings, Davis said he accepted Miller's explanation that the amendment mentioned only Order 996-A, and not Order 996, because the order "was used just to define the depths ... [and] both orders give the same depths." Davis did not ask Miller to revise the amendment to add a reference to Order No. 996.
Later in 1994, Discus successfully recompleted three wells in the Hosston Formation: the Noel Estate # 3 well, located on the Noel property, which produced oil, and two gas wells located in the 640-acre gas unit which included the Noel property, the W.H. Hillier # 1 and the Bolinger # 2-Alt. wells. As mentioned, the respective rights of the parties in the oil production are not in dispute.
On February 6, 1995, some ten months after the amendment was executed, Miller wrote this letter to the operator of the two gas wells, Petro-Chem Operating Co., Inc.:
The Petro-Chem Hiller # 1 and Bolinger # 2 wells [sic] are producing gas wells located on the referenced unit. As both of said wells commenced producing in 1994 and as Mrs. R.H. Noel has not been remitted any payment for her share of the production proceeds, she is compelled to give you the notice provided under articles 137 et Seq. of the Mineral Code of the State of Louisiana and intends invoking all rights under the cited statutes should you fail to account for her interest in the aforesaid production within thirty (30) days from your receipt of this letter.
(Our emphasis.)
*113 The statutes referred to in Miller's letter, La. R.S. 31:137 et seq., require a mineral lessor to give written notice of the lessee's "failure ... to make timely or proper payment of royalties" as a prerequisite to bringing an action for damages or for dissolution of the lease. Our emphasis.
Petro-Chem's land and division order manager, Phyllis Powell, testified she received Miller's demand letter as a follow-up to his phone inquiry "about payment of the royalty and how I determined Mrs. Noel's interest." Ms. Powell said she told Miller that because there were producing properties throughout the gas unit, she calculated Mrs. Noel's interest by dividing the number of acres leased (160) by the total number of acres in the unit (slightly more or less than 640) and multiplying that fraction by 20 percent, the amount of Mrs. Noel's royalty interest under the 1994 amendment to the lease.
Mrs. Powell could not recall whether Miller immediately agreed with her calculation of Mrs. Noel's interest. She testified Miller did not claim that Mrs. Noel's interest was something other than a royalty interest in their initial phone conversation or in his follow-up demand letter of February 6, 1995.
According to Ms. Powell, Miller first asserted that Mrs. Noel's gas rights in the Hosston Formation were not included in the amendment to the lease by phone at some later time in 1995, after Mrs. Noel had deposited several Petro-Chem checks for her royalty interest in the gas production as calculated by Ms. Powell. Ms. Powell did not remember the date of Miller's call. She testified, however, that Petro-Chem "would have made arrangements prior to that time to get the problem resolved ... if we determined or thought that [Mrs. Noel's] interest wasn't leased[.]"
On the advice of Miller, Mrs. Noel declined to sign Petro-Chem's division order classifying her interest in the production from the two gas wells as a royalty interest rather than a working interest.
Miller, an experienced oil and gas consultant who is not a lawyer, testified that he was generally familiar with the provisions of the Mineral Code referred to in his demand letter (La. R.S. 31:137 et seq.) but he could not recall or recite their exact provisions. His understanding of the statutes was that "when someone had your share of production you had the right to demand payment." Miller emphasized that his demand letter simply referred to Mrs. Noel's "interest" or "share of the production proceeds" from the gas wells, without specifying whether her interest was a royalty interest or a working interest.
Miller testified he did not intend to concur in Petro-Chem's classification of Mrs. Noel's interest in the gas production as a royalty interest, either by referring to La. R.S. 31:137 in his demand letter or by depositing the Petro-Chem royalty checks.

TRIAL COURT FINDINGS ON INTENT
Notwithstanding the reference to Order No. 996-A in the amendment to the lease, and the omission of a reference to Order No. 996, the trial court found that the parties did not intend to restrict the lease rights of Discus in the Hosston Formation to oil production.
The court initially examined the amendment on its face without considering the extrinsic evidence. The court observed that the first paragraph of the amendment clearly limits the lessee's rights to a single mineral formation, but does not expressly limit or restrict those rights to a single mineral product within that formation. The court found it "very significant" that the second paragraph of the amendment affirmed the validity and effectiveness of the original lease, which was unrestricted as to both mineral formations and products. Also significant to the court was the fact that the amendment was prepared by the agent for Mrs. Noel, the party advancing the more restrictive interpretation of the document. Construing the written agreement as a whole, the court concluded that the amendment, on its face, "goes beyond just limiting th[e lessee's rights] to the oil." Our brackets.
The court reached the same conclusion after considering the extrinsic evidence on the issue of intent, obviously finding Davis's testimony more credible than Miller's. The court also deemed Miller's demand letter for *114 Mrs. Noel's "share" of the Hosston gas production under Article 137 of the Mineral Code, which deals with demands for nonpayment of royalties, to be inconsistent with Mrs. Noel's interpretation of the amendment, notwithstanding Miller's testimony "that he did not really know what that article meant."

DETERMINATION OF INTENT
The trial court's findings on the factual issue of intent are governed by the manifest error standard of review on appeal. McDuffie, supra; Sanders, supra.
In determining the intent of the parties to a written agreement, the court must construe the disputed provision together with the rest of the contract, giving the entire document a practical, reasonable and fair construction. La. C.C. arts.2045-2052; Lambert v. Maryland Cas. Co., 418 So.2d 553 (La.1982); McDuffie, supra.
When intent cannot be clearly ascertained from the face of the agreement, the court may consider the written provisions in light of other pertinent evidence, including the nature of the contract, the circumstances surrounding its formation, the understanding of the parties as to what was intended, the conduct of the parties before and after the agreement was executed, prior dealings between the parties, if any, and the equities and regular business practices pertaining to contracts of a similar nature. La. C.C. arts. 2053-2055; McDuffie, supra; Allen v. Burnett, 530 So.2d 1294 (La.App. 2d Cir.1988). See also Henry v. Ballard & Cordell Corp., supra and TR Drilling Co., Inc. v. Howard, 463 So.2d 923 (La.App. 2d Cir.1985).
In case of doubt that cannot be otherwise resolved, the disputed provision must be interpreted against the party who prepared the contract, unless the other party should have provided an explanation which does not appear in the agreement. La. C.C. arts.2056-2057; McDuffie, supra; Allen, supra.

DISCUSSION
On this record, we cannot say the trial court was clearly wrong in finding that the parties did not agree to restrict the amendment to a single mineral product, whether their intent be determined only from the face of the lease documents and DOC orders, as Mrs. Noel has urged here and below, or from the combination of those documents and the extrinsic evidence, as Discus argues.
The original lease to Discus was granted "for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals" from the leased property, without restricting the lessee's rights to a particular mineral formation or to a single mineral product. The amendment to the lease affirms the validity of the original lease except that it grants exploratory rights to the Hosston Formation as defined in Order No. 996-A and in the amendment.
The statement of consideration in the amendment refers to the mineral formation in which Discus agrees to conduct its operations to recomplete the Noel Estate # 1 well: "the Hosston Formation as defined under Order No. 996-A...." The amending clause states that the lease is amended "to cover all depths from 6,597 ft. to 8,600 ft. as defined in the above referenced order No. 996-A." The written agreement does not refer to Order No. 996-A to define a particular mineral product or production unit oil or gasto be covered by the amendment.
It is obvious from the two DOC orders establishing separate oil and gas units for production from a single formation that there may be both oil zones and gas zones at differing intervals within the Hosston Formation. It is also clear from the original lease and the amendment that the parties intended by the 1994 amendment to reinstate the lease as to the Hosston Formation, and that they defined the boundaries of that formation by its subsurface footage or depth as determined in a nearby well, the only meaningful way to define a mineral formation which is known to be productive of either or both oil and gas.
Miller and Davis knew that both oil and gas had been commercially produced from several mineral formations in the Plain Dealing Field in Bossier Parish after the original lease was executed. Agreeing with Davis's testimony that it is impossible to *115 determine from a test log whether a potentially productive mineral zone in a given formation will contain oil or gas, Miller testified, "[U]p there in Plain Dealing you're never certain what you're going to get" until the zone is perforated.
Considering this undisputed testimony, it would be patently absurd to conclude, as Mrs. Noel suggests, that the common intention of the parties to the amendment was to allow Discus to explore the Hosston Formation for either or both oil and gas, and to share in the production proceeds if the mineral produced from that formation happened to be oil, subject to Mrs. Noel's royalty interest, but for Discus to cede or relinquish to Mrs. Noel any interest in gas production that Discus might discover while testing the Hosston Formation.
Neither Miller nor Davis mentioned any limitation on the product to be covered by the amendment in the written correspondence documenting their verbal negotiations. Miller knew that Discus wanted to test the Hosston Formation for either or both oil and gas, admitting that he construed the reference to "testing ... the Hosston Formation" in Davis's April 13, 1994 letter to mean "the full Hosston formation." Miller's handwritten reply conveys Mrs. Noel's agreement to allow Discus "to complete in Hosston under your 1973 lease," without expressing any intention of his client to restrict the amendment to a single mineral product. Our emphasis.
Davis's concern about the reason for Miller's reference to Order No. 996-A in the written agreement is evidenced by Davis's handwritten notation on the executed copy of the amendment that Order No. "996-A [was] used only to define the depths [of the Hosston Formation] per phone conversation with Dick Miller." Our brackets and emphasis. The trial court obviously believed Davis's account of this conversation, finding Davis more credible than Miller, who denied any discussions with Davis about why Miller referred to only one of the two DOC orders in the amendment.
When Miller learned that Discus was producing gas from the Hosston Formation after the amendment was executed, Miller demanded Mrs. Noel's "share of the production" from the two "producing gas wells located on the referenced [gas] unit ... under Articles 137 et Seq. of the Mineral Code...." Miller did not squarely assert, in this letter or in any other written correspondence on Mrs. Noel's behalf, whether Mrs. Noel's interest in the gas produced from the Hosston Formation was a working interest or a royalty interest. The written assertion that her interest in the gas production was a working interest was first made in her petition for a declaratory judgment. Recognizing that the acceptance of royalty checks asserted to have been inaccurately computed does not automatically estop or preclude a royalty owner from later claiming a greater percentage of production, we have discussed this circumstance because it bears on the intent of the parties to the amendment.
With or without consideration of the extrinsic evidence, the record clearly supports the trial court's interpretation of the amendment to the lease.

DECREE
At the cost of Mrs. Noel, the judgment is AFFIRMED.