755 So.2d 376 (2000)
James H. BLANCHARD, Jr., et al., Plaintiffs-Appellants,
v.
PAN-OK PRODUCTION COMPANY, INC., et al., Defendants-Appellees.
No. 32,764-CA.
Court of Appeal of Louisiana, Second Circuit.
April 5, 2000.
*377 Klotz, Simmons & Reeks by F. John Reeks, Jr., Shreveport, Counsel for Appellants.
G. Tim Alexander, III, Lafayette, Counsel for Appellee, Pan-OK Production Co., Inc.
Shuey, Smith & Reynolds by John M. Shuey, Jr., Shreveport, Counsel for Appellees, Newiel, Inc. and Loutex Production Co.
Tucker, Jeter, Jackson & Hickman by T. Haller Jackson, III, Shreveport, Counsel for Appellees, Margaret C. Agurs Tucker and Mary Betty Rogers.
Before WILLIAMS, STEWART and GASKINS, JJ.
STEWART, J.
At issue in this appeal by James H. Blanchard, Jr., Gary E. Patterson, and Melodye Tanner Patterson (hereinafter referred to collectively as "plaintiffs") is the interpretation of a mineral lease granted by the plaintiffs' ancestors in title in favor *378 of Newiel, Inc./Loutex Production Company ("Newiel") and its assignee, Pan-OK Production Company, Inc., (hereinafter referred to collectively as "defendants"). The plaintiffs filed suit after the defendants refused to release from the lease certain depths pursuant to a "Release of Lower Strata" clause included within the lease. The plaintiffs also sought injunctive relief and damages from alleged trespasses by the defendants over property adjacent to the leased premises. After the trial court's denial of their claims, the plaintiffs filed the instant appeal. We affirm.

FACTS
On May 1, 1996, the plaintiffs executed a cash sale deed for the purchase of approximately 1,000 acres of land located in Sections 14 and 15 of Caddo Parish for a price of $375,000. The sellers, Margaret Cornelia Agurs Tucker and Barbara Fletcher Dudley as administratrix of the Succession of Peggy Fletcher Agurs (hereinafter referred to as the "Agurs family"), reserved all of the oil and gas royalty in the two tracts of land until May 1, 2001 and reserved one-half the royalty thereafter from May 1, 2001 until May 1, 2006. At the time of the sale, Section 15, which consists of approximately 620 acres of land, was subject to an oil, gas, and mineral lease granted by the Agurs family on August 1, 1995, to Newiel. The lease had a primary term of one year. During the primary term, Newiel drilled two gas wells in the Paluxy formation at depths of approximately 2,850 feet. Effective June 1, 1996, Newiel executed an Assignment and Bill of Sale transferring all of its interest in the lease as to the Cotton Valley "D" ("CVD") formation to Pan-OK.
According to records from the State of Louisiana, Office of Conservation, rules for development of the CVD formation of the Greenwood Field in Caddo Parish were promulgated by Order No. 193-B on January 5, 1954.[1] The Greenwood Field included the land in Section 15. Records indicate that Stanolind Oil and Gas Company (also referred to in the record as "Amoco") began drilling on October 22, 1955 and completed a gas well in the CVD formation at depths in the area of 8,400 feet on January 4, 1956. Production began on February 6, 1956. This well, referred to as the Agurs B No. 1 well ("Agurs well"), is located in Section 15 and is at the center of this appeal.
The Agurs well produced until 1994, when production ceased. It remained nonproductive at the time Newiel obtained its lease for Section 15. Newiel attempted to re-establish production from the Agurs well, but was unsuccessful. Thereafter, Newiel transferred its lease interest in the CVD zone, which included the Agurs well, to Pan-OK through the assignment and bill of sale. Pan-OK first attempted to obtain production from the Agurs well by hooking a test compressor to the system and then by placing a wire line rig on it. The Agurs well produced for a few days and then "salted up" and would no longer produce. Kurt Carleton, the president of Pan-OK, concluded that the Agurs well needed to be "worked over." According to Carleton, a workover rig was used to clean out the Agurs well. Six hours were spent jarring on the well. Tubing was removed from the well hole. A bailer was used to remove approximately fifteen to twenty feet of fill consisting of frack, salt, and other grit that had covered roughly half of the perforations in the well casing. Tubing was placed back in the well, swabbing operations were conducted using the work-over rig, and flow testing was conducted for two hours. Pan-OK conducted these operations from July 24, 1996 through July 31, 1996, prior to expiration of the primary term of the lease, at a cost of $46,741. Production in commercial quantities resulted from Pan-OK's efforts.
*379 In early September 1996, Blanchard became aware that Newiel had assigned its lease interest in the CVD formation to Pan-OK. Blanchard, representing himself and the Pattersons, wrote to Pan-OK on September 11, 1996 to inform Pan-OK that he could not locate any right-of-way authorizing road access through Section 14 to reach the Agurs well located in Section 15. Pan-OK and Newiel, as well as prior lessees and operators of wells in Section 15, had since 1955 traversed an old oil field road running through Section 14 to access wells in Section 15. Blanchard also informed Pan-OK of his belief that as of August 1, 1996, the expiration date of the primary term of the lease, rights to the CVD zone were no longer held under the lease. Blanchard wrote that the lease required the "release of all depths below 100 feet below the deepest producing strata drilled during the primary term." According to Blanchard, the deepest producing strata drilled during the primary term was the Paluxy formation, which was the depth of the two wells drilled by Newiel during the primary term of the lease. The Agurs well from which Pan-OK obtained production had been drilled in 1955. Therefore, Blanchard believed that he was entitled to a release of all depths below 100 feet below the Paluxy formation, which would include release of rights to the CVD formation and the Agurs well.
In response to Blanchard's demands, Newiel granted a partial release on October 7, 1996 of its rights 100 feet below the base of the CVD formation. Blanchard found this partial release inadequate, and in a letter dated October 23, 1996, he again demanded release of all depths below 100 feet below the Paluxy formation. Blanchard further demanded that Newiel and Pan-OK cease crossing Section 14 to access Section 15 and that Pan-OK both cease operation of the Agurs well and remit a percentage of the proceeds from any sales therefrom. Pan-OK contended in a response on November 4, 1996, that the lease clause at issue did not require drilling as a condition to hold the lease rights. Pan-OK asserted that the Agurs well was not producing at the time of the lease and that through its efforts, restoration of production was achieved. Furthermore, Pan-OK asserted that it was the intent of the original lessors that efforts be made to restore production in the CVD formation.
In subsequent correspondence, Blanchard continued to contend that Pan-OK's activities with regard to the Agurs well did not satisfy the terms of the lease and to demand release of depths below the Paluxy formation. It was Blanchard's position that the language of the lease was clear and very specific. As such, Blanchard did not believe that the intent of the parties to the lease was relevant. Pan-OK continued to insist that restoration of production was sufficient to hold the lease as to depths 100 feet below the CVD formation. In an effort to resolve the dispute, Pan-OK offered to lease from Blanchard and the Pattersons their mineral interests in Section 15 and to purchase a right of way across Section 14. Blanchard rejected the offer.
On December 27, 1996, the plaintiffs filed a suit against the defendants to enforce the lease and obtain release of depths 100 feet below the Paluxy formation, specifically all depths below 2,815 feet. The plaintiffs also sought payment of a percentage of the revenues from sales of production from the Agurs well. Additionally, the plaintiffs sought relief from the alleged trespass by the defendants who used the old oil field road located on Section 14.[2] The plaintiffs reasserted their *380 claims in a supplemental and amending petition filed August 6, 1997, and prayed for a preliminary injunction to enjoin the defendants from utilizing Section 14 for access to Section 15.
A hearing on the request for a preliminary injunction was held on September 15, 1997. In a written opinion, the trial judge denied injunctive relief upon finding that the defendants showed a right under the Newiel lease to utilize the road in Section 14.
The matter proceeded to a trial on the merits. At issue was the meaning of the "Release of Lower Strata" clause in the lease, specifically whether Pan-OK's operations which restored production from the Agurs well were sufficient to hold the lease to depths of 100 feet below the CVD formation, and whether the defendants had a right of way across Section 14 allowing access to Section 15. The trial court ruled in the defendants favor on both claims. The trial court determined that Pan-OK's rework or recompletion of the Agurs well, which resulted in restoring production at commercial levels, was sufficient to hold the lease to a depth of 100 feet below the CVD formation. The trial court also determined, in accordance with the earlier ruling on the preliminary injunction, that the defendants, as lessees and assignees, had a contractual right under the lease to use the oil field road in Section 14 to access Section 15.

DISCUSSION
The plaintiffs contend that the "Release of Lower Strata" clause in the lease is clear and unambiguous, that parol evidence regarding the intent of the parties to the lease should not have been admitted into evidence, and that the operations conducted by Pan-OK were not sufficient to hold the lease to a depth of 100 feet below the CVD formation. The plaintiffs also contend that the lease provides no authority for the defendants to traverse Section 14 to access wells on Section 15. We will first address the plaintiffs' contentions regarding the trial court's interpretation of the "Release of Lower Strata" clause.

Release of Lower Strata Clause
The lease at issue is a standard Bath Form lease. The "Release of Lower Strata" clause is included in an attachment to the lease labeled Exhibit "A." Exhibit "A" provides, "The provisions of this Exhibit control over the printed lease text." The "Release of Lower Strata" clause provides as follows:
Lessee shall release to Lessors and agrees to sign documents releasing this lease 100 feet below the deepest producing strata completed by Lessee during the primary term (one year) of this lease, or an extension of said lease pursuant to the terms of Paragraph 6 hereof, regarding cessation of production. Merely spudding or commencing an operation to a deeper strata shall not suffice and said deeper strata shall be canceled from this lease, ipso facto, subject to the foregoing provisions.
The dispute between the parties involves the meaning of the phrase "strata completed by Lessee" and particularly the meaning of "completed."
Throughout the trial, the plaintiffs contended that the term "completed" is a term of art or technical term in the oil and gas industry, that its meaning is determinable from expert testimony alone, and that evidence of the intent of the parties to the lease should not be admitted. However, after hearing expert testimony, which will be discussed infra, the trial court permitted testimony regarding intent over the plaintiffs' objections.
In a written opinion, the trial court found that the term "completed" has different meanings in the oil and gas industry depending upon the context in which the term is used and the intent of the parties. The trial court also found that it was the *381 intent of the parties to the lease to obtain production in commercial quantities. The trial court determined that Pan-OK's activities, which the court referred to as a rework or recompletion of the Agurs well, resulted in re-establishing commercial production from the CVD formation and that this was the only way to obtain such production in a commercially feasible manner. In reaching this conclusion, the trial court rejected the plaintiffs' argument that "completed," as used in the clause, requires a new well or production from a new zone in an existing well.
There are two issues for our consideration at this juncture. The first is whether the term "completed," as used in the "Release of Lower Strata" clause, is ambiguous and subject to more than one meaning, thus allowing for the introduction of extrinsic evidence of intent. The second is whether the trial court correctly found that the clause conveyed the parties intent to simply obtain production in commercial quantities. The determination of ambiguity in a lease provision is one of law and is reviewed on appeal by an independent examination of the contract. We consider only whether the trial court's conclusion is legally correct, without giving any deference to that conclusion. Noel v. Discus Oil Corp., 30,561 (La.App.2d Cir.5/13/98), 714 So.2d 105, 107, and cases cited therein. When it is permissible for the trial court to consider extrinsic evidence of the intent of the contracting parties and such evidence conflicts, the trial court's ruling on intent is reviewed under the manifest error standard. Id.
The purpose of interpretation of a contract is to determine the common intent of the parties. La. C.C. art.2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation need be made search of the parties' intent. La. C.C. art.2046. Although words of a contract must be given their generally prevailing meaning, words of art or technical terms must be given their technical meaning when the contract involves a technical matter. La. C.C. art. 2047. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art.2048.
Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless there is ambiguity in the written expression of the parties' common intent. A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation. Noel v. Discus Oil Corp., supra. These rules are applicable even to contracts involving rights in immovable property, such as mineral rights. Id.
With these legal precepts in mind, we have conducted a thorough and independent examination of the record, which includes expert testimony regarding usage of the term "completed" and its variants in the oil and gas industry as well as definitions from secondary sources utilized in the industry. The lease at issue does not define "completed." As such, resort to expert testimony was necessary to determine the meaning and usage of the term in the oil and gas industry.
James Broussard, a district manager for the Office of Conservation, discussed the meaning of the terms "completion" and "recompletion" as used for purposes of the Office of Conservation. Broussard explained that "completion" refers to the initial or first completion of a well, which requires drilling and production. Recompletion requires a change in the perforated interval or zone. Under the Office of Conservation usage, the date production was first obtained from the CVD formation would be the date of completion. Broussard testified that he has not heard the type of work performed by Pan-OK on the Agurs well referred to as either a completion or recompletion; however, he also testified *382 that the Office of Conservation does not have a definition for the term "work-over." Most tellingly, Broussard admitted that many engineers and geologists cannot agree on the meaning of terms in the oil and gas industry and that he could only vouch for the Office of Conservation's classifications.
Robert McGinnis testified on behalf of the plaintiffs as an expert in petroleum engineering. McGinnis testified that he would classify the work done by Pan-OK on the Agurs well as a rework or work-over, rather than as a completion or recompletion. According to McGinnis, a completion or recompletion always requires involvement of a new zone; a work-over is performed to restore or enhance a well's production.
Henry C. Coutret testified on behalf of the defendants as an expert in petroleum engineering. He was also called to testify during the plaintiffs' case-in-chief. Coutret stated that he would agree that, in the context used by the Office of Conservation, the work done by Pan-OK on the Agurs well would be considered a workover or rework. However, Coutret explained that Pan-OK's activities resulted in a completed well. He explained that once a well is restored to production, it is completed in a particular zone and that others in the industry have referred to doing a workover to get a good completion in a zone. According to Coutret, "completion" has a number of meanings depending upon the context in which it is used. In a broad sense, completion means mechanically equipping a well so that the subsurface formation is open to the flow of hydrocarbons from the formation through the well bore and to the surface for sale. Coutret stated that this process "absolutely" can result from a successful workover and that a workover might include, but would not require, drilling or perforating a new zone.
Also included in the record is a definition of "well completion" meaning "the activities and methods necessary to prepare a well for the production of oil and gas; the method by which a flow line for hydrocarbons is established between the reservoir and the surface."[3] This definition coincides with the broad definition of completion given by Coutret. Excerpts from another secondary source show multiple uses and definitions of the term "complete" and its variants in the oil and gas industry and defines such terms and phrases as "completion," "completed well," "completion of a well," and "completion operations" among others.[4] The phrase "completed well" is broadly defined, in part, as "a well capable of producing oil and gas." None of the evidence presented defined "strata completed" as used in the release clause.
These excerpts, along with the expert testimony, persuade us that the term "completed" or the phrase "deepest producing strata completed by lessee" used in the "Release of Lower Strata" clause is ambiguous and fairly susceptible to more than one interpretation, even though the term "completed" is a term of art or technical term used in the oil and gas industry. The record shows that many variants of the term "completed" are used in different contexts in the oil and gas industry. While we are cognizant of the plaintiffs' point that all the experts referred to Pan-OK's activities as a workover or reworking of the Agurs well, this factor neither clarifies the ambiguities in the clause at issue nor determines whether Pan-OK's activities which resulted in production from the Agurs well satisfies the requirements of the clause.
Our finding of ambiguity in the meaning of "completed" is supported by a similar *383 finding in Burns v. Louisiana Land & Exploration Co., 870 F.2d 1016 (5th Cir. 1989). Burns involved review of a summary judgment holding that reworking operations extended a lease. Extension of the lease would occur only if termination of unsuccessful reworking operations constituted, within the meaning of the lease at issue, the completion of a dry hole. The lease did not specifically state whether completion encompasses reworking operations without drilling, and a detailed examination of the lease provisions did not, in the court's opinion, support a narrow view of completion as encompassing only drilling operations and not reworking. The court also examined definitions of "completion" in Williams & Meyers, Manual of Oil and Gas Terms (7th ed.1987). From its examination of this authority, the court found that while "the meaning of `completion' assumes that a hole has just been drilled, the term is considered indefinite and is not explicitly restricted to drilling." Based on this finding, the court concluded that "completion of a dry hole," as used in the lease, could occur after either drilling or reworking.
As in Burns, supra, we believe that the term "completion," as used in the lease, is indefinite in its meaning and not preclusive of reworking operations. We find that the trial court correctly concluded that the term "completed" as used in the "Release of Lower Strata" clause is ambiguous, thus it was permissible and necessary to allow extrinsic evidence of the contracting parties' intent.
Having determined that it was permissible for the trial court to consider extrinsic evidence of intent, we must now review the trial court's ruling on intent under the manifest error standard. The plaintiffs contend that the trial court's interpretation of the "Release of Lower Strata" clause constituted a reformation of the lease in violation of their rights as a third party. We disagree. This matter does not involve reformation of a contract, but it does involve interpretation of a lease provision found to be ambiguous.
To establish the intent of the parties to the lease, the defendants called Thomas Haller Jackson, III, the attorney who negotiated the lease on behalf of the Agurs family. Jackson testified that the ultimate goal of the lease was to obtain production in paying quantities in order to provide a royalty for the lessors. With regard to the "Release of Lower Strata" clause, Jackson explained that it was intended to achieve production and to require release of depths 100 feet below the deepest producing strata. Jackson could not otherwise say why he chose to use the word "completed" rather than some other term, but he noted that there were a number of ways he could have phrased the clause and that he did not consult any legal or technical sources for guidance in choosing the term. Jackson also testified that the release clause did not require the lessee to either drill a well or perforate a new zone; it was simply to assure production by the lessee.
Newton Dorsett, the president of Newiel, also testified that he "absolutely" understood that reworking a well and obtaining production would hold the lease. Dorsett explained that his attempts to obtain production from the Agurs well were unsuccessful, so he executed an assignment and bill of sale in favor of Pan-OK for rights to the CVD formation and the Agurs well. Kurt Carleton, president of Pan-OK, also testified that Newiel was unable to obtain production in paying quantities from the Agurs well, but that commercial production was obtained after Pan-OK reworked the well.
In rebuttal, the plaintiffs presented the testimony of James Light, a petroleum landman, who had negotiated with Jackson an almost identical lease between the Agurs family and TXO Production Corporation in 1987. The TXO lease also included a "Release of Lower Strata" clause, which, according to Light, meant that TXO had to drill a new well or deepen an existing hole. Light testified that Jackson *384 wanted the leased premises developed and wanted activity to occur through completion of a well and that Jackson was interested in further development and production. However, Light also testified that he did not recall why Jackson used "completed by lessee" and he did not recall Jackson saying that the lessees could not utilize existing wells. It was also revealed during Light's testimony that he has a close relationship with Blanchard and that Blanchard now works for him.
From our review of the testimony, we believe that the trial court correctly determined that the goal of the lease was to obtain production from the leased premises. Although Light testified that the "Release of Lower Strata" clause requires either drilling a well or deepening an existing well, he did not testify that Jackson used the phrase "completed by lessee" in the clause to ensure that such activities would occur. Furthermore, Light's testimony pertained only to the intent of the parties to the TXO lease and not to the intent of the parties to the lease at issue here. When a lease provision is doubtful, it must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. (Emphasis added.) La. C.C. art.2053. Based on this article, the meaning or intent of any provision in a lease between the Agurs family and TXO would not be instructive in our interpretation of the Newiel lease.
The evidence also established that the Agurs well had ceased commercial production in 1994 and that commercial production in paying quantities was not achieved thereafter until Pan-OK completed the rework at a substantial cost in July 1996. There was also testimony that the operations conducted by Pan-OK were necessary to achieve production from the Agurs well. According to Coutret, it would have been uneconomical to drill a new well in the CVD formation. Coutret estimated the cost of drilling a new well as $700,000 and estimated the present value of future production over a nine year period to be approximately $300,000. When questioned by the defendants about his estimations, Coutret explained that he examined the production data and well history since 1956 and estimated the present value of future production based on the presumption that any new well in the CVD formation would be equivalent to the existing Agurs well. Coutret also stated that it would be "highly improbable" that more significant production would result from another well in the CVD formation. No evidence in the record rebuts Coutret's testimony regarding future production from the CVD formation or the cost of drilling a new well.
Based on the testimony presented on the issue of intent, we find no manifest error in the trial court's finding that the parties to the lease intended to obtain production in commercial quantities and that the "reworking" by Pan-OK, which restored production from the Agurs well, was sufficient to hold the lease up to 100 feet below the CVD formation under the "Release of Lower Strata" clause. A simple reading of the release clause shows that its intent was to obtain production and to release nonproducing depths. As provided in the release clause, "merely spudding or commencing an operation to a deeper strata" would not suffice to maintain the lease; production was the key requirement. By reworking the Agurs well, Pan-OK obtained production from the CVD formation and secured its rights to 100 feet below the CVD formation. We find no merit to the plaintiffs' assignments of error on the issue of the release clause.

Adjacent Lands
As stated previously, the plaintiffs contend that the defendants have trespassed on their land by using an oil field road located on Section 14 to gain access to wells on Section 15. The trial court, both on a motion for a preliminary injunction and on the merits of the claim, rejected the plaintiffs' contention and found that *385 the lease granted the defendants the right to traverse Section 14 to gain access to Section 15. The plaintiffs argue on appeal that the defendants have neither a contractual right nor any legal servitude allowing them access to Section 15.
The relevant lease provision for our consideration of this issue is the granting clause set forth in the first paragraph of the lease. This clause provides, in part, as follows:
1. Lessor ... hereby grants, leases, and lets exclusively unto Lessee for the purposes of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines, and other structures thereon to produce, save, take care of, treat, transport and own said products and for dredging and maintaining canals, constructing roads and bridges, and building houses for its employees, and, in general, for all appliances, structures, equipment, servitudes and privileges which may be necessary, useful or convenient to or in connection with any such operations conducted by Lessee thereon, or on any adjacent lands, ....
The provision then sets forth a property description for Section 15 and ends with a "Mother Hubbard" or cover-all clause which states, "This lease also covers and includes battures, accretions and all other land owned by Lessor adjacent to the land particularly described above."
Recently, the Louisiana Supreme Court in Caskey v. Kelly Oil Co., 98-1193 (La.6/29/99), 737 So.2d 1257, examined the purpose of the "adjacent lands" clause in the context of a trespass action brought by a mineral lessor against the lessees to enjoin their use of a road on the leased premises to access operations on an adjacent tract of land. The court stated that an "adjacent lands" clause expressly provides "that the lessee may use the surface of the leased premises to conduct operations on adjacent land which is not owned by the lessee." The court went on to say:
An "adjacent lands" clause, although constituting a significant burden on the leased premises, promotes the efficient development of oil and gasfields and the state's public policy of developing mineral resources. The clause was intended to permit a lessee to develop an oil and gas field without regard to property lines and without the necessity of constructing duplicative roads, pipelines, tank farms and other facilities.
Caskey, 737 So.2d at 1263. The court distinguished the "adjacent lands" clause from the cover-all or "Mother Hubbard" clause, also included in the lease, by indicating that a "Mother Hubbard" clause protects the lessee in the event that the property description fails to include adjacent lands owned by the lessor, whereas the "adjacent lands" clause refers to operations conducted on the leased land or on adjacent land, "regardless of whether the adjacent land is owned by the lessor." As such, the "Mother Hubbard" clause applies only to lands owned by the lessor, and the "adjacent lands" clause applies to adjacent lands which may or may not be owned by the lessor. The court concluded that the lessees, pursuant to the adjacent lands clause, could use the road on the leased premises to conduct mineral operations on the adjacent lands provided such use constituted a reasonable exercise of their contractual rights.
The plaintiffs argue that the granting clause would allow the defendants to utilize Section 15, the leased premises, in connection with other operations conducted on adjacent lands, but that it does not allow the defendants to utilize Section 14 in connection with their operations on Section 15. This argument gleans some support from Caskey, supra, in that the facts at issue in that case present a situation opposite from the circumstances in the instant dispute. *386 Here, the defendants/lessees have been using a road located on adjacent land to conduct its operations on the leased premises, whereas in Caskey, the lessees utilized a road on the leased premises to conduct operations on adjacent land not owned by the lessor. It appears that the plaintiffs' argument is further supported by the reference in the granting clause to "any adjacent lands" which indicates that the clause grants the lessee use of the leased premises even in connection with operations conducted on adjacent lands, but grants no similar rights to use adjacent lands to conduct operations on the leased premises.
Also, the "Mother Hubbard" clause, to which the trial court made reference in its opinion, would not support the defendants' use of Section 14 for access to Section 15. As discussed in Caskey, supra, cover-all clauses protect the lessee in the event of inadequate or incorrect property descriptions. We find no basis in the record to suggest that by inclusion of the cover-all clause in the Newiel lease the parties meant to also include Section 14, which consists of approximately 431 acres, in the lease.
Although we have not found a contractual basis for use of the road on Section 14 by the defendants, we believe that such use is permissible by analogy to a right of passage due to an enclosed estate which results from a voluntary alienation or partition. La. C.C. art. 694 provides:
When in the case of partition, or a voluntary alienation of an estate, or of a part thereof, property alienated or partitioned becomes enclosed, passage shall be furnished gratuitously by the owner of the land on which the passage was previously exercised, even if it is not the shortest route to the public road, and even if the act of alienation or partition does not mention a servitude of passage. The right of passage due under Article 694 is a gratuitous right, distinct from other servitudes of passage, for which the dominant estate is not bound to indemnify the subservient estate. Fuller v. Wright, 464 So.2d 350 (La.App. 2d Cir.1985), writ denied, 465 So.2d 737 (La.1985). Article 694 explicitly requires the owner of the land on which the right was previously exercised to furnish the enclosed estate a gratuitous right of passage, even if it is not the shortest route and even if it is not mentioned in the act of alienation or partition. Howes v. Howes, 499 So.2d 314 (La.App. 1st Cir.1986); Fuller v. Wright, supra. The only requirement for enforcement of the right of passage is that the right must have been previously exercised or used. Fuller v. Wright, supra. Furthermore, Article 16 of the Mineral Code, La. R.S. 31:16, provides that mineral rights, such as the mineral lease, are real rights. Mineral lessees, as holders of a real right, may seek a servitude of passage. Salvex v. Lewis, 546 So.2d 1309 (La.App. 3rd Cir. 1989), writ denied, 551 So.2d 1323 (La. 1989).
Stipulations entered into evidence establish that an oil field road through Section 14 was constructed by Amoco and has been used since 1955 in conjunction with production from the Agurs well. The stipulation also provides that the oil field road was the only way in and out of the well location for the Amoco pumpers. The record shows the existence of an asphalt road referred to as Devers Road on the north boundary of Section 15; however, there is no road leading from Devers Road to the Agurs well which is centrally located in Section 15. Blanchard testified at the hearing on the preliminary injunction, the transcript of which was filed into evidence, that he was not familiar with any other way to access the Agurs well other than by the oil field road over Sections 14 and 15.
*387 When Newiel leased Section 15 from the Agurs family in 1995, the Agurs family owned Sections 14 and 15, with the exception of a lesser amount of acreage not relevant to this proceeding. Newton Dorsett testified that Newiel began using the oil field road in its operations. Since entering the lease, Newiel has maintained the road by grading it several times, dozing it, and hauling gravel and rock. Pan-OK also began using the oil field road to access the Agurs well once it obtained assignment of lease rights from Newiel and has worked with Newiel to maintain the road. When the dispute over the right of way arose, Pan-OK obtained an estimate indicating that the cost of building a road from Devers Road on the north boundary of Section 15 to the Agurs well location would be $115,000. The record shows that the terrain over the northern area of Section 15 is low lying ground and is traversed by a bayou measuring 40 feet in width and 20 feet in depth. A bridge and a number of culverts would be needed along any road built from Devers Road to the Agurs well site.
Based on these facts, we find that a gratuitous right of passage, as provided for in Article 694, exists in favor of the defendants. Passage over the oil field road through Section 14 has been previously exercised since 1955. By leasing the mineral interests in Section 15 to Newiel, the Agurs family essentially enclosed that estate as to its lessee. No other route to the well site exists even though the northern boundary of Section 15 is along a public road. While we are mindful that an enclosed estate is defined in La. C.C. art. 689 as an estate with no access to a public road, jurisprudence supports the possibility of finding an enclosed estate where the expense and inconvenience of making a passage over one's own land would be so great as compared with the inconvenience to the neighboring estate of a right of passage. See Pousson v. Porche, 6 La. Ann. 118 (1851). This particular case presents such a situation. The evidence shows that the cost of building a road would be prohibitive due to the nature of the terrain where the road would be located.[5] The evidence also shows that Blanchard was aware of the existence of the oil field road and its use prior to the plaintiffs' purchase of Sections 14 and 15 from the Agurs family. Additionally, no damage from the defendants' use of the road has been shown.
Also persuasive is the fact that Sections 14 and 15 are not owned by separate landowners. Rather, these adjoining tracts of land are both owned by the plaintiffs and were both owned by the Agurs family prior to the sale to the plaintiffs. Under these circumstances, the equities weigh in favor of finding a right of passage in favor of the defendants. No burden is placed on third parties who derive no benefit and will derive no future benefit from the mineral lessees' operations. While we have determined that the "adjacent lands" clause is not applicable here, the policies underlying the purpose of the clause, as discussed in Caskey, supra, and quoted above, are also promoted by allowing a right of passage under the specific facts of this case.
Although the trial court erred in finding a conventional right of passage through Section 14, we find that a right of passage in favor of the defendants does exist as a legal servitude under Article 684.

*388 CONCLUSION
For the reasons set forth, we find that the trial court correctly determined that the defendants have maintained the Newiel lease according to its terms, and we find that the defendants are due a gratuitous right of passage pursuant to La. C.C. art. 684 along the oil field road traversing Sections 14 and 15. Accordingly, we affirm the trial court's judgment at the appellants' cost.
AFFIRMED.
NOTES
[1] The Greenwood Field is also referred to as the Greenwood-Waskom Field in the Office of Conservation's records.
[2] In answer, Pan-OK alleged the existence of competing and conflicting claims for the royalties due from production from the Agurs well and requested deposit of the royalty proceeds into the registry of the court pursuant to a concursus proceeding so that the competing claims could be asserted. The plaintiffs claim for a percentage of the royalties appeared in conflict with the cash sale deed by which they purchased the property. The cash sale deed included a reservation of royalties, as discussed supra, on behalf of the vendors, Margaret Cornelia Agurs Tucker and the Succession of Peggy Fletcher Agurs.
[3] See A Dictionary of Petroleum Terms, Petroleum Extension Service, The University of Texas at Austin, page 137, (1976).
[4] See Howard R. Williams and Charles J. Meyers, revised and updated by Patrick H. Martin and Bruce M. Kramer, Manual of Oil and Gas Terms, (Matthew Bender, 10th Ed., 1997).
[5] In cases involving application of the "shortest route rule" under La. C.C. art. 689, exceptions have been allowed where the shortest route would cross areas impassable at times due to flooding, where construction of the shortest route through a swampy area would be too expensive, or where the shortest route would require construction of a bridge. See Watts v. Baldwin, 95-0260 (La.App. 1st Cir. 10/6/95), 662 So.2d 519, 523, and cases cited therein. These considerations of extenuating circumstances which supported exceptions to the "shortest route" rule also support our finding of an enclosed estate in this instance, especially since no third person is burdened in this case by the exercise of the existing right of passage.