THIBODEAUX, Judge.
This is an appeal of summary judgment in favor of defendant, Union Texas Products Corporation (Union Texas), and against plaintiff, ARCO Oil & Gas Company (ARCO). ARCO filed suit for declaratory judgment concerning certain language in a contract between it and Union Texas. After discovery was completed, both sides moved for summary judgment. After oral argument, the trial judge granted Union Texas’ summary judgment and dismissed ARCO’s action with prejudice. ARCO appeals from this judgment, asserting error in the trial court’s interpretation of certain language in a provision of the contract. We affirm.
PACTS
The facts of this case are not disputed. In 1961, ARCO’s predecessor-in-interest, Sinclair Oil & Gas Company (Sinclair), entered into a gas purchase and sales contract with Texas Eastern Transmission Corporation (Texas Eastern) for natural gas produced by Sinclair on the Sligo Field in Bossier Parish, Louisiana.
Near the Sligo Field, Union Texas Natural Gas Corporation (Union Texas Natural), predecessor-in-interest to defendant, owned and operated a natural gas processing plant. In 1962, Union Texas Natural entered into a processing agreement with Sinclair whereby certain liquid hydrocarbons would be extracted from the gas before being sold to Texas Eastern.
On October 20, 1972, the purchase contract between Texas Eastern and ARCO, which had succeeded to Sinclair’s rights, was amended to set out pricing methods for gas purchases. Both parties agreed that if federal regulations passed setting a maximum legal rate for gas purchase, ARCO’s price for gas would assume the new legal limit. In 1978, the Federal Energy Regulatory Commission enacted the Natural Gas Policy Act which allowed producers to collect a maximum legal price on a thermal value basis, determined by the quantity of British Thermal Units (btu’s) per thousand cubic feet (mcf’s) of natural gas. This is significant in that the quantity of btu’s per mcf differs with the quality of the natural gas sold.
In processing the natural gas at its plant, Union Texas extracts certain liquid hydrocarbons. The products of the hydrocarbons, such as butane and propane, are called “plant products.” Union Texas sells the products and pays ARCO a share for the proceeds. The remaining gas, called “residue gas” is sold by ARCO to Texas Eastern at the “tail gate” of the plant.
The volume of the gas is reduced upon processing. The reduction is due partially to the extraction of the plant products from the stream, partially from the use of some of the gas for fuel to run the plant, and partially for unknown reasons. This reduction and resulting loss is generally referred to as “shrinkage.”
In April of 1990, it became apparent to ARCO that it was making less money by *250 processing the natural gas than it could make if it sold directly to the purchaser. Upon this discovery, it sought to invoke the provision of its processing contract with Union Texas commonly referred to as the “keep whole” clause.
The clause contains the following language:
During any time that the net proceeds from the sale of Plant Products retained by Producer [ARCO] is less than the gas sales value of such volume lost attributable to Producer, Producer shall inform Plant Owner [Union Texas] and within thirty (30) days thereafter Plant Owner shall either agree to pay Producer the difference between the value of such net proceeds retained by Producer and the gas sales value of the volume lost attributable to fuel gas, shrinkage and losses had same been delivered to Producer’s gas purchaser [Texas Eastern], or agree to bypass Producer’s gas around the Plant so long as such condition exist.
It based its contention on a thermal valuation of the shrinkage lost expressed in terms of btu’s per mcf. On August 1, 1990, ARCO formally requested Union Texas either make “keep whole” payments or agree to bypass the plant.
Union Texas refused to exercise either of the options in the provision. Instead, it argued ARCO was using an incorrect valuation rate for shrinkage. It contended the valuation of the shrinkage should be on a volumetric rate. As a result, ARCO filed suit for a declaratory judgment requiring Union Texas to comply with the terms of the “keep whole” provision.
After discovery, cross summary judgments were filed. After hearing oral arguments, the trial judge took the matter under advisement and ultimately concluded that ARCO and Union Texas had, over nearly thirty years, and by their conduct and actions, shown their intent to measure shrinkage loss on a volumetric basis. This finding was based on Union Texas’ having compensated ARCO for excess shrinkage gas on a volumetric value rate on numerous occasions as required by an “excess shrinkage” provision in the same article of the contract as the “keep whole” provision.
ISSUE
The sole issue before this court is whether or not the trial court erred in interpreting the “keep whole” provision as requiring Union Texas to account to ARCO for shrinkage gas on a volumetric (mcf) value basis rather than a thermal (btu) value basis.
LAW & ANALYSIS
The correct interpretation of a contract requires a determination of the intent of the parties. La.C.C. art. 2045. Where the language of the contract is clear and unambiguous and leads to no absurd consequences, no further search for the parties’ intent should be made. La.C.C. art. 2046. Where words or provisions in the contract are susceptible to more than one meaning, the meaning given must be that which renders the contract effective and best reflects the object of its makers. La.C.C. arts. 2048, 2049. However, if the meaning of a provision is doubtful, the interpretation must be made in accordance with the nature of the contract, equity, usages, the parties’ conduct prior and subsequent to the formation of the contract, and according to other contracts of a like nature between the same parties. La.C.C. art. 2053.
In the present case, the interpretation of the contract cannot be made solely by reference to the face of the instrument. Interpretation is made difficult by the multiplicity of meanings possible for certain terms used. In order to properly interpret the contract, it is necessary for this court to examine the situations and events surrounding its creation and performance.
The portion of the processing contract in question is titled “Article VII Residue Gas.” The language in dispute is contained in what is commonly referred to as the “keep whole” provision of the contract. Of particular concern to us is the determination of the meaning of “the gas sales value of such volume lost attributable to fuel gas, shrinkage gas, and losses attributable to Producer.”
*251 ARCO contends the focus should be on the word “value.” It argues the value of the shrinkage gas should be measured in btu’s, as that is the rate scale on which residue gas is sold to Texas Eastern. It asserts the intent of the “keep whole” provision would be undermined if it is interpreted alternatively because the object of the provision is to prevent ARCO from losing money. ARCO compares the “keep whole” provision to an “escape clause” in the processing contract in favor of Union Texas that allows it to close the plant or sell to ARCO should it become unfeasible to continue plant operations. Lastly, ARCO points to Article XX of the processing contract which provides that in areas of inconsistency, the processing contract is subservient to the provisions in the purchasing contract between ARCO and Texas Eastern. ARCO argues that the determination of “value” is not clear and thus shrinkage should be valued in accordance with the purchase contract.
Union Texas argues the focus of the language in the “keep whole” provision should be on the word “volume” as it clearly indicates the volumetric valuation prevails. It argued successfully to the trial court that for years all business conducted between the parties, not limited to just shrinkage gas, had been done on a volumetric basis.
Union Texas’ strongest argument concerns how the parties have valued shrinkage in the past. While the “keep whole” clause was never previously invoked, within that same Article is the “excess shrinkage” clause. The “excess shrinkage” clause provides that Union Texas may use up to four and one half percent (4V2%) of the volume of producer’s gas, as shrinkage, during production. However, should Union Texas exceed that percentage, the provision states “[Union Texas] shall pay [ARCO] for its proportion of such excess at the price then in effect under [ARCO’s] Gas Purchase Contract with [Texas Eastern] dated July 1, 1961 as amended and supplemented.”
From the foregoing language, it appears the purchase contract between ARCO and Texas Eastern controls the value placed on the volume of excess shrinkage gas. In the course of nearly thirty years, whenever Union Texas has exceeded 4V2, it has always compensated ARCO, either by paying cash or by supplying gas, based on a volumetric rate. The record reflects this pattern of conduct. There are affidavits, depositions and accounting documents clearly showing the amount owed on excess shrinkage has always been determined based on volume and not on the thermal unit.
ARCO and Texas Eastern amended the purchase contract in 1970 in anticipation of federal regulations. The regulation was implemented no later than 1978. At that time, ARCO began charging Texas Eastern on a thermal unit basis; however, it continued charging Union Texas for excess shrinkage based on the value of the volume and not on the quantity of btu’s. It was not until 1990, when ARCO brought in five new wells with a high quantity of btu’s per mcf, that it chose to invoke its “keep whole” clause. In doing so, it argued that the gas sales value of the volume of shrinkage gas under that provision was to be based in thermal units, contrary to its method of determining the value of the same shrinkage gas under the “excess shrinkage” clause.
A party’s intent in entering a contract can be determined by how it operates under the contract. Kenner Industries v. Sewell Plastics, 451 So.2d 557 (La.1984). Of particular assistance in determining intent is an observation of the manner and consistency in which the contract was performed over a period of years. Gamble v. D.W. Jessen & Associates, 509 So.2d 1041 (La.App. 3d Cir.1987).
Since 1962, the parties have always placed a volumetric value on the natural gas lost to shrinkage under the “excess shrinkage” provisions of the contract. The “keep whole” provision also requires a value be placed on shrinkage lost during production. Both provisions are within the same article. To give a volumetric value for shrinkage under the “keep whole” agreement is consistent not only with the *252 laws of contract interpretation, but also with the actions of the parties in performance of the contract over the years. We conclude that the volumetric value best reflects the intent of the parties and the object of the provision.
ARCO also argues that the processing contract is subservient to the purchasing contract. While the purchase contract may prevail in areas of inconsistency, here there is no inconsistency save for that created by ARCO’s interpretation. A consistent reading of the provisions of the processing contract shows no deviation from the volumetric standard. The two standards from the different contracts are not inconsistent because the provisions are not interrelated. Under the language of the processing contract, shrinkage has a volumetric value, and under the purchasing contract, residue gas has a thermal value. Accordingly, we find ARCO’s assignment of error to be without merit and the grant of summary judgment is affirmed.
CONCLUSION
For the foregoing reasons, the judgment of the trial court, granting Union Texas’ summary judgment and dismissing ARCO’s suit, is affirmed. All costs of this proceeding are to be paid by appellant.
AFFIRMED.