660 So.2d 158 (1995)
J. Bryan McDUFFIE d/b/a McDuffie Enterprises, Plaintiff-Appellee,
v.
RIVERWOOD INTERNATIONAL CORPORATION, Defendant-Appellant.
No. 27292-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1995.
*159 C.A. Martin, III, Monroe, for appellant.
Donald L. Kneipp, Monroe, for appellee.
Before WILLIAMS and STEWART, JJ., and PRICE, J., Pro Tem.
WILLIAMS, Judge.
This case involves a suit on an open account and a breach of contract claim filed by J. Bryan McDuffie, d/b/a McDuffie Enterprises, ("McDuffie") against Riverwood International Corporation ("Riverwood"). Riverwood filed a reconventional demand seeking to recover payments made to McDuffie by reason of McDuffie's alleged overbilling. Riverwood appeals the trial court's judgment *160 in favor of McDuffie, awarding him the amount due on unpaid invoices submitted to Riverwood and damages for Riverwood's breach of contract. We affirm.

FACTS
McDuffie, a retired Riverwood employee, began performing work for Riverwood as an independent contractor in 1989. In addition to his services as an independent contractor, McDuffie also contracted with Riverwood to supply the services of other Riverwood retirees. Billing for these services was to be established through McDuffie's sole proprietorship, McDuffie Enterprises.
Following negotiations with Riverwood, McDuffie sent a letter, dated May 3, 1989, to Riverwood setting forth his personal rates. The letter, referred to as the "day rate letter" or the "rates on file letter," indicated his fee to be $300 per day plus expenses. During the next two and one-half years, McDuffie worked several jobs for Riverwood, many of which overlapped, and each of which was authorized under a separate purchase order. McDuffie billed Riverwood $300 per day per job for his services. He indicated that it was his understanding that he was to be paid $300 a day per job, whether he worked two hours or twenty-four hours on a job. During this time there were no complaints from Riverwood regarding McDuffie's simultaneously working under more than one purchase order or regarding the quality of his work. However, in early 1992, Riverwood claimed that McDuffie was overbilling and ceased paying his submitted invoices.
Under the agreement known as the "blanket order," McDuffie provided the services of retired Riverwood employees. He provided insurance coverage for these employees and billed Riverwood at the employee's rate multiplied by 1.4, to cover insurance costs, overhead and profit. The blanket order provided that either party may terminate the agreement by thirty-day written notice. On February 21, 1992, by means of a cancellation order marked for "internal distribution only," Riverwood internally terminated the agreement. Riverwood did not give McDuffie notice of termination.
Litigation ensued. Riverwood appeals the trial court's ruling in McDuffie's favor in reference to the "rates on file letter" and the "blanket order."

DISCUSSION
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. In order to reverse a factfinder's determination, the reviewing court must review the record in its entirety and meet the following two-part test: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Through Dept. of Transportation and Development, 617 So.2d 880 (La.1993).
Interpretation of a contract is the determination of the common intent of the parties. LSA-C.C. Art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. Art. 2046. However, when the terms of a written contract are susceptible to more than one interpretation, or where there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, extrinsic evidence is admissible to clarify the ambiguity or to show the parties' intent. Doyal v. Pickett, 628 So.2d 184 (La.App. 2d Cir.1993). Such intent is to be determined in accordance with the plain, ordinary and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable and fair basis. Lindsey v. Poole, 579 So.2d 1145 (La. App. 2d Cir.1991), writ denied, 588 So.2d 100 (La.1991). Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. Art. 2050. A doubtful provision must be *161 interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. LSA-C.C. Art. 2053. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. LSA-C.C. Art. 2056. However, if doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor. LSA-C.C. Art. 2057.
One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for a period of many years. Spohrer v. Spohrer, 610 So.2d 849 (La.App. 1st Cir.1992). Whether a contract is ambiguous is a question of law. Spohrer, supra. However, intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Futch v. Futch, 26,149 (La.App. 2d Cir. 09/23/94), 643 So.2d 364. Where the mutual intention of the parties has not been fairly explicit, the court may consider all pertinent facts and circumstances, including the parties' own conclusions, rather than adhere to a forced meaning of the terms used. Futch, supra.

Rates On File Letter:
Riverwood contends that the trial court erred in finding that Riverwood was not entitled to a set off and damages for the multiple days billed by McDuffie. It argues that the terms of the rates on file letter are clear on its face and the trial court erred in considering extrinsic evidence to determine the intent of the parties. Riverwood also argues that if the rates letter is ambiguous, it should be construed against McDuffie because he drafted the letter and failed to properly explain its terms.
The principal dispute is whether McDuffie's letter of May 3, 1989, constitutes an agreement to furnish his personal services on multiple projects for Riverwood for a flat rate of $300 per day. The rates letter lists his fee for consulting and services as "$300/Day". Riverwood argues that the language of the rates letter is clear and explicit and there is no need to otherwise determine the intent of the parties. However, the rates letter, in and of itself, is not a contractual agreement. The purchase orders issued by Riverwood to McDuffie, the rate letter, by virtue of its being referenced in purchase orders, and the invoices submitted to Riverwood by McDuffie, combine to comprise the terms of the agreements between Riverwood and McDuffie.
According to McDuffie, his understanding of the agreement with Riverwood was that if he worked two or twenty-four hours on a particular job or project, he could charge that project for the full daily rate. As a result, McDuffie billed the daily rate for each project he worked on during a twenty-four hour period. Riverwood contends, however, that McDuffie properly could charge the daily rate only once for a twenty-four hour period, regardless of the number of hours he worked or the number of different projects on which he worked. However, counsel for Riverwood acknowledged that under Riverwood's interpretation, if McDuffie worked, for example, four hours in a twenty-four hour period on one project, he would be paid the full daily rate. After reviewing the record in its entirety, we are persuaded that the terms of the agreements having to do with rate are susceptible to different interpretations. Under the circumstances of the case, we conclude that the trial court did not err in admitting extrinsic evidence at the trial.[1]
McDuffie testified that when Riverwood initially approached him about working on a particular project, he and William Don Tatum, then director of engineering for Riverwood, discussed his rates. Tatum, however, testified that he did not recall discussing McDuffie's rates. Subsequently, Riverwood *162 requested that McDuffie submit a proposal, i.e. the rates on file letter. McDuffie indicated that his first letter was rejected by Riverwood because it was not sufficiently detailed. He further stated that he discussed his understanding of what constitutes a day with various Riverwood personnel, including Richard Earl Crawford, Richard Terry Tullos, and Jeffery B. Touzet. McDuffie also testified that in his experience as a consultant, he found that other paper industry consultants considered a day to be from the time they went on the job until they left the job, regardless of whether it was one hour or twenty-four hours.
Touzet, a Riverwood purchasing manager, testified that he was involved in the negotiations of the rates on file letter in that he had "to come up with the dollars" but that one of his department employees handled the administrative aspects. As Touzet recalled, he and McDuffie agreed that "$300 a day would be the rate that he would charge us for a day's work, the travel, the lodging, and the meals." In this regard, Touzet's recollection is not only different from McDuffie's, but is also different from the contents of the rates on file letter accepted by Riverwood, and from Riverwood's subsequent conduct in paying invoices in which travel, lodging, and other expenses were itemized in addition to the $300 fee. Touzet testified that he did not recall any discussion as to what constitutes a day or concerning multiple, simultaneous jobs. In addition, Touzet testified in detail as to how purchase orders and invoices are processed at Riverwood. We note that there are several safeguards in place, such as requiring three signatures on a purchase order and having different staff responsible for verifying rates and verifying units on invoices.
Tullos, a Riverwood maintenance superintendent, testified that he did not recall any discussion with McDuffie regarding what constitutes a day. He indicated, however, that he considers a day to be "approximately eight hours." Tullos acknowledged that he never communicated this to McDuffie. Tullos' testimony indicates that he was aware that some of McDuffie's jobs at Riverwood overlapped.
Crawford, an engineer and project manager at Riverwood, was also aware that some of McDuffie's jobs at Riverwood overlapped. He corroborated McDuffie's testimony that the two of them had discussed McDuffie's understanding of what constitutes a day. Crawford testified that had McDuffie worked, for example, two hours in a given day, he would have been paid the full daily rate.
Riverwood contends that if the rates letter is ambiguous it must be construed against McDuffie. We disagree. Although McDuffie wrote the letter, its contents were derived from his negotiations with Riverwood. Riverwood even rejected McDuffie's first draft. Although McDuffie and Riverwood apparently agree that a day means from one to twenty-four hours, the ambiguity regarding the rates arises because of Riverwood's practice of issuing multiple purchase orders, i.e. a new purchase order for each job or project for which it sought McDuffie's services.
Both McDuffie and Riverwood's purchasing manager, James Donald Halsell, testified that in order for McDuffie to be paid for his work on a job, a purchase order had to be issued by Riverwood. In May 1989, McDuffie was already working under one purchase order, approved by Halsell, when he was requested to and undertook work on an additional project. On June 25, 1989, after having begun work on the second project but not having received a purchase order, McDuffie sent a letter, along with a time sheet reflecting the days he had worked on the second project, to Halsell requesting a purchase order number for the second job. A purchase order for the second project was issued in response to McDuffie's letter. Thus, Halsell was aware that there was one outstanding purchase order when he authorized a second. Furthermore, since this incident occurred within two months of McDuffie's beginning to do contract work for Riverwood, Riverwood was on notice early as to McDuffie's understanding of the arrangement. Yet, Riverwood, for two and one-half years, issued a new purchase order, at the daily rate, for each job or project for which it sought McDuffie's services.
*163 We have considered and are unpersuaded by Riverwood's arguments that McDuffie, by virtue of his familiarity with Riverwood's management structure and functioning, successfully concealed double-billing from Riverwood. In addition, we note that the trial court expressly found McDuffie's testimony to be generally truthful. The trial court, which made a considered effort to be certain that it understood the interpretations of each party before ruling, noted that under Riverwood's interpretation of the agreements there would be no incentive for McDuffie to agree to undertake additional projects. After reviewing the record in its entirety and considering the manner in which the agreements were performed, as well as all pertinent facts and circumstances of the case, we conclude that the trial court did not err in ruling in favor of McDuffie and in awarding him $37,770.10, the amount due on unpaid invoices.

Blanket Order:
Riverwood also contends that the trial court erred in awarding damages to McDuffie for Riverwood's termination of the "blanket order." Riverwood argues that it was not bound by the blanket order unless and only to the extent that blanket order releases were issued by Riverwood authorizing the hiring of employees under the blanket order. Riverwood further asserts that it was not required to issue blanket order releases to McDuffie.
While it is correct that Riverwood was not required to issue blanket order releases to McDuffie and that it incurred no liability to McDuffie unless such a blanket order release was issued, such is irrelevant to the matter at issue. The blanket order, which had been extended through August 31, 1992, clearly and explicitly provided that it may be cancelled by either party with 30-day written notice. No further interpretation need be made. Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Spohrer, supra.
Touzet testified that he cancelled the blanket order February 21, 1992, effective immediately, and directed that the cancellation order be marked for internal distribution only. Both McDuffie and Touzet testified that McDuffie was not given 30-day written notice that the blanket order was cancelled.
At the time of cancellation, three employees were working at Riverwood under McDuffie's blanket order. At Riverwood's direction, coverage of two of the workers was transferred to a blanket order held by another contractor, Don Johnson. Thus, McDuffie was deprived of the profit he would have earned during the duration of the work done under the blanket order release or thirty days, whichever was shorter, for having supplied these two workers. After a review of the record before us, we conclude that the trial court was not clearly wrong in awarding damages of $3,822 to McDuffie for Riverwood's breach of the blanket order.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs are assessed to Riverwood International Corporation.
AFFIRMED.
NOTES
[1] Riverwood argues that the trial court erred in admitting extrinsic evidence without first making a finding that the rates letter was ambiguous. However, as we read the record, the finding of ambiguity in the agreements is implicit in the trial court's ruling.