766 So.2d 685 (2000)
TOTAL MINATOME CORPORATION, Plaintiff-Appellant,
v.
UNION TEXAS PRODUCTS CORP., et al., Defendants-Appellees.
No. 33,433-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 2000.
*686 Hargrove, Pesnell & Wyatt by Joseph L. Hargrove, Jr., Shreveport, Counsel for Appellant.
Simon, Peragine, Smith & Redfearn by Joseph Thomas Hamrick, Jr., Robert L. Redfearn, Jr., New Orleans, Counsel for Appellees.
*687 Before BROWN, STEWART and CARAWAY, JJ.
STEWART, J.
Total Minatome Corporation ("TMC"), the plaintiff in this contractual dispute, appeals a summary judgment in favor of the defendants, Union Texas Products Corporation, Union Texas Petroleum Corporation, and Western Gas Resources, Inc., (referred to collectively herein as "Union Texas"). We find no error in the trial court's judgment and affirm.

FACTS
This is a contractual dispute involving a Processing Agreement and a Compression Agreement confected by the parties' respective predecessors-in-interest for the purpose of processing natural gas in a natural gas liquids extraction plant. The defendants, as did their predecessors, operate a gas processing plant associated with the Sligo gas field in Bossier Parish. The plaintiff, as did its predecessors, produces gas from the Sligo field and furnishes the gas to the plant for processing. Valuable liquid hydrocarbons or "plant products" are stripped from the gas stream at the plant, and the processed gas or "residue gas" is delivered for sale to pipelines at the outlet or "tailgate" of the plant. Until the advent of this suit, there was no dispute as to the interpretation and application of the two agreements, and there was no dispute as to the course of conduct of the parties and their predecessors under the two agreements.
The Processing Agreement was entered into on November 25, 1960 by Texas Gas Exploration Company, a producer of natural gas from certain gas leases located in the Sligo Field in Bossier Parish, Louisiana and TMC's predecessor, and by Union Texas Natural Gas Corporation, the plant owner and Union Texas' predecessor.[1] The Processing Agreement provided for the construction and operation of a natural gas processing plant by the plant owner near the producer's pipeline in the Sligo field area and for the delivery of natural gas produced from the lease by the producer to the plant owner for the extraction of valuable hydrocarbons from the gas. Subject to the plant owner's option of shutting down the plant should its operations become unprofitable, the agreement was to continue in full force and effect for the life of the gas lease, including all extensions or renewals thereof.
The Compression Agreement was entered into on May 27, 1970 by Texas Gas Exploration Corporation, the producer of natural gas and TMC's predecessor, and Union Texas Petroleum, the plant owner and Union Texas' predecessor. The purpose of the agreement was to provide for the compression of dry or residue gas out of the plant and into the pipeline of the purchaser, Texas Gas Transmission Corporation ("TGT"). The plant owner agreed to compress the producer's gas into TGT's pipeline at the outlet of the plant for a fee of "one and one-half cents per thousand cubic feet of gas compressed" to be paid by the producer. The Compression Agreement was for an initial term of two years and was to continue thereafter on a year-to-year basis with each party having the option of canceling the agreement at the end of any year upon giving 30 days prior written notice.
According to the plaintiffs petition, TMC merged with CSX Oil and Gas Corporation, formerly Texas Gas Exploration Corporation, on April 27, 1988, thus succeeding to its predecessors rights under the two agreements. According to the defendants' answer, Western succeeded Union Texas Petroleum Corporation and Union Texas Products Corporation; the latter succeeded Union Texas Petroleum *688 Corporation, which succeeded Union Texas Natural Gas. The record contains no showing, other than the allegations of the petition and answer, as to how the parties assumed or were assigned the obligations under the two agreements.
In the latter part of 1991, approximately three years after the merger apparently placed TMC in the position of producer under the two agreements, Theodore J. Oberle, TMC's supervisor of revenue accounting, began to question the application of certain provisions under the Processing Agreement. Through his examination of the Processing Agreement and discussions with Nathan Jagan, a revenue supervisor with ARKLA Exploration Company, Oberle determined that provisions concerning excess fuel gas and shrinkage payments, severance tax payments, and low pressure gas compression charges were being misapplied to TMC's detriment.[2] When Oberle discovered the existence of the Compression Agreement in 1994, he determined that TMC had been improperly assessed with compression charges in violation of that agreement.
On August 30, 1994, TMC filed the instant suit asserting three causes of action based on the Processing Agreement and one cause of action based on the Compression Agreement.[3] TMC asserted that Union Texas violated the Processing Agreement by (1) failing to pay for excess fuel and shrinkage at the price set forth in the agreement (the "Excess Fuel and Shrinkange Claim"); (2) failing to reimburse TMC for payment of severance taxes levied on plant products which Union Texas was required to pay by the terms of the agreement (the "Severance Tax Reimbursement Claim"); and (3) failing to pay for compression of low pressure gas into the plant (the "Compression Charge Claim"). TMC also asserted that Union Texas violated the Compression Agreement by erroneously charging TMC for compression of gas for delivery into pipelines other than TGT's pipeline (the "Compression Charge Deduction Claim").
Following discovery, both parties moved for summary judgment. In a judgment rendered June 17, 1999, the trial court granted Union Texas' motion for summary judgment and dismissed all of TMC's claims. On appeal, TMC asserts that the trial court erred in granting summary judgment in favor of Union Texas and that the trial court failed to correctly apply Louisiana law governing interpretation of contracts.

DISCUSSION

Applicable Law
Appellate courts review summary judgments de novo under the same criteria which governs the trial court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of LSU, 591 So.2d 342 (La.1991); Will-Drill Resources, Inc. v. Huggs Inc., 32,179 (La.App.2d Cir.8/18/99), 738 So.2d 1196, review denied, 99-2957 (La.12/17/99), 751 So.2d 885; Berzas v. OXY USA, Inc., 29,835 (La.App.2d Cir.9/24/97), 699 So.2d 1149. The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by law. La. C.C.P. art. 966(A)(2). A motion for summary judgment is properly granted if the pleadings, answers to interrogatories, depositions, and admissions *689 on file, together with any affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B); Pugh v. Beach, 31,361 (La.App.2d Cir.12/11/98), 722 So.2d 442.
TMC asserts that no genuine issues of material fact exist since both parties moved for summary judgment and that the trial court erred as a matter of law in denying its motion for summary judgment and granting Union Texas' motion. According to TMC, the trial court's ruling was contrary to the clear and unambiguous language of the pertinent provisions in the two agreements. In contrast, Union Texas asserts that each of TMC's claims required the trial court to consider provisions in the agreements that did not specifically address the situation presented and that are susceptible of different meanings. Union Texas also asserts that the trial court reached the correct result because consideration of the parties' and their predecessors' undisputed course of conduct in interpreting the agreements during the years preceding this lawsuit shows the true intent of the parties to the agreement.
Contract interpretation is a question of law subject to a de novo review on appeal. Will-Drill Resources, Inc., supra. The following standards for the interpretation of contracts as set forth in McDuffie v. Riverwood Intern. Corp., 27,292 (La. App.2d Cir.8/23/95), 660 So.2d 158, 160-161, are instructive to our review of the summary judgment in this instance:
Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art.2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art.2046. However, when the terms of a written contract are susceptible to more than one interpretation, or where there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, extrinsic evidence is admissible to clarify ambiguity or to show the parties' intent. Doyal v. Pickett, 628 So.2d 184 (La.App. 2d Cir.1993). Such intent is to be determined in accordance with the plain, ordinary and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable, and fair basis. Lindsey v. Poole, 579 So.2d 1145 (La. App. 2d Cir.1991), writ denied, 588 So.2d 100 (La.1991). Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art.2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. C.C. art.2056. However, if doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor. La. C.C. art.2057.
One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for period of many years. Spohrer v. Spohrer, 610 So.2d 849 (La.App. 1st Cir.1992). Whether a contract is ambiguous is a question of law. Spohrer, supra. However, intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Futch v. Futch, 26,149 (La.App.2d Cir.9/23/94), 643 So.2d 364. Where the mutual intention of the parties has not been fairly explicit, the court may consider all pertinent facts *690 and circumstances, including the parties' own conclusions, rather than adhere to a forced meaning of the terms used. Futch, supra.

As will be seen in our analysis of the individual claims asserted by TMC, we agree with Union Texas' position that the contract provisions at issue either do not address the situation presented or are susceptible of different meanings. Generally, when a contract is determined to be ambiguous, an issue of material fact exists, and the matter is not ripe for summary judgment. See Lankford v. Koch Gateway Pipeline Co., 98-0719 (La.6/5/98), 713 So.2d 464 and Brundage v. Bean Energy, Inc., 509 So.2d 112 (La.App. 1st Cir.1987). However, in this instance, where no issue of fact exists as to the past conduct and course of dealing of the parties and their predecessors over many years, the factual issue of intent may be resolved on summary judgment. See Arco Oil & Gas. Co. v. Union Texas Products Corp., 610 So.2d 248 (La.App. 3rd Cir.1992), wherein summary judgment was affirmed based on an examination of the undisputed facts of the situations and events surrounding the creation and performance of a gas processing contract, rather than by reference to the face of the contract, which included terms that were subject to a multiplicity of meanings.

Excess Fuel and Shrinkage Claim
Article IV, Section 3 of the Processing Agreement states:
Producer agrees to furnish its proportionate share, not to exceed four and one-half percent (4-½%) of its wet gas volume as measured at Plant absorber inlet, for fuel gas and shrinkage gas used at the Plant at no cost to Plant Owner. The amount of Producer's gas used for fuel gas and shrinkage gas shall be determined by multiplying the total quantity of fuel gas and shrinkage gas consumed in the Plant in any calendar month by the percentage that Plant Products attributable to Producer's gas in such month bear to the total Plant Products for such month. Should such volume of fuel gas and shrinkage gas exceed four and one-half per cent (4-½%) in any month, Plant Owner will pay Producer for its proportion of such excess at the contract sales price at the lease.
According to the parties, the percentage of fuel gas and shrinkage gas used at no cost to the plant owner was increased to 5.2% by letter agreement dated April 28, 1965. Article IV requires TMC to furnish 5.2% per month of its wet gas volume as measured at the plant inlet for fuel gas and shrinkage at no cost to Union Texas. When the amount of fuel gas and shrinkage exceeds 5.2% per month, Union Texas is required to pay its proportion of the excess at the "contract sales price at the lease."[4]
TMC contends that Union Texas has failed to pay for the excess fuel gas and shrinkage at the price set forth in the agreement. Rather than pay the "contract sales price at the lease," which TMC equates to the wet gas volume at the inlet of the plant which has a higher British Thermal Unit ("BTU") value, Union Texas' payments have been based on the residue gas or dry gas at the tailgate of the plant which has a lower BTU value. The trial court determined that use of the lower BTU value from the residue gas at the tailgate of the plant to calculate the excess fuel gas and shrinkage payment was supported by the conduct of the parties and their predecessors over a 30 year period.
It is undisputed that the parties to the Processing Agreement have over the course of the years used the lower outlet BTU value to calculate the excess fuel gas and shrinkage payment. It was not until the latter part of 1991, that Theodore Oberle *691 questioned the calculation of the excess fuel gas and shrinkage payment. According to Oberle, TMC calculated the amount of the excess fuel gas and shrinkage payment due on a monthly basis and provided the price to Union Texas. Oberle explained in his deposition that TMC's accountants calculated the price using the lower BTU value of the residue gas because that was the way it had been done in the past. Consequently, the price for the excess fuel gas and shrinkage had been calculated in error all the years since the confection of the agreement. Oberle opined that the "contract sales price at the lease" is simply a reference to the wet gas volume at the inlet of the plant, thus indicating that the correct calculation of the excess fuel gas and shrinkage payment must be based on the higher BTU value of the wet gas at the inlet of the plant.
Our review of the Processing Agreement and the exhibits on summary judgment, particularly the deposition of Mr. Oberle, persuades us that no material issue of fact exists as to the correct calculation of the excess fuel gas and shrinkage payment using the lower BTU factor of the residue gas at the outlet of the plant. For approximately thirty years, the various parties to the agreement have calculated the excess fuel gas and shrinkage payment in this manner. Contrary to TMC's position, the language of the Processing Agreement is not clear and unambiguous and nothing in the clause at issue equates wet gas volume with the "contract sales price at the lease." Had the original parties to the agreement intended to use the wet gas volume value to calculate the excess fuel gas and shrinkage payment, then explicit reference could have been made to that value rather than to the term "contract sales price at the lease."
The record shows no basis for calculation of the excess fuel gas and shrinkage payment based on a "contract sales price at the lease" because there appears to be no actual sale of gas at the producer's lease. In his deposition, Oberle explained that the "contract sales price at the lease" represents the higher BTU value of the wet, unprocessed gas which would be sold directly if the plant was not there to process the gas. This situation does not exist. The wet gas is not sold at the lease. As such, reference to the "contract sales price at the lease" constitutes an ambiguity or an unworkable provision which the parties to the agreement have interpreted, through their course of conduct over the years, as referring to the lower BTU value of the residue gas at the outlet of the plant. The intent of a party in entering a contract can be determined by how it operates under the contract. Kenner Industries v. Sewell Plastics, 451 So.2d 557 (La.1984); Arco Oil & Gas Co., supra. The observation of the manner and consistency in which the contract was performed over the years is of particular assistance in determining intent. Arco Oil & Gas Co., supra. In this instance, the intent of the parties is clear due to the consistent manner of operation under the Processing Agreement in calculating the excess fuel and shrinkage charge over the course of nearly thirty years.
Additionally, we note that use of the value of the residue gas to calculate the excess fuel and shrinkage charge is supported by the fact that the loss to TMC from fuel use and shrinkage is a loss in the volume of residue gas available for it to sell at the outlet of the plant. The processing agreement defines "residue gas" as "all gas remaining after the separation of condensate and vapor phase equivalent of plant products, and less the proportionate share of plant fuel attributable to Producer's gas...." Calculation of the excess fuel gas and shrinkage charge based on the value of residue gas reimburses TMC for its actual loss.
We conclude that summary judgment in favor of Union Texas is appropriate as to TMC's excess fuel and shrinkage claim.

Severance Tax Reimbursement Claim
Article XIV of the Processing Agreement provides in pertinent part:

*692 All taxes and assessments or similar charges, whether Federal or State, which now or hereafter may be imposed or levied upon the production, severance or gathering of the gas processed hereunder up to and including the delivery thereof to Plant Owner at the point of delivery shall be borne and paid by Producer.
. . .
All production or severance taxes levied during any month on the Plant Products derived from Producer's gas by any duly constituted authority shall be paid by Plant Owner.
Under this provision, TMC is required to pay all taxes levied upon production, severance, or gathering of the gas. Union Texas is required to pay production or severance taxes levied on plant products. TMC claims that it and its predecessors have paid taxes on plant products since February 1983 and that Union Texas owes reimbursement for these payments. TMC's claim is based upon a 1983 amendment to La. R.S. 47:633(9) which, according to TMC, imposed a severance tax on the natural gas liquids processed at the plant.
La. R.S. 47:633, which sets forth the tax rates, provides in relevant part:
The taxes on natural resources severed from the soil or water levied by R.S. 47:631 shall be predicated on the quantity or value of the products or resources severed and shall be paid at the following rates:
(9) On natural gas and, based on equivalent gas volumes, natural gasoline, casinghead gasoline, and other natural gas liquids, including but not limited to ethane, methane, butane or propane, seven cents per thousand cubic feet,....
Prior to the 1983 amendment, La. R.S. 47:633(9) began with "On gas," rather than with the phrase "On natural gas and, based on equivalent gas volumes, natural gasoline...." While La. R.S. 47:633 sets forth the rate of taxation, the tax is imposed by La. R.S. 47:631 which levies taxes authorized by the Louisiana Constitution upon "all natural resources severed from the soil or water, including ... minerals such as oil, gas, natural gasoline,...." La. Const. Art. 7, § 4(B) authorizes the following severance tax:
(B) Severance Tax. Taxes may be levied on natural resources severed from the soil or water, to be paid proportionately by the owners thereof at the time of severance. Natural resources may be classified for the purpose of taxation. Such taxes may be predicated upon either the quantity or value of the products at the time and place of severance. No further or additional tax or license shall be levied or imposed upon oil, gas, or sulphur leases or rights.
The severance taxes authorized in La. Const. Art. 7, § 4 and levied by La. R.S. 47:631 are excise taxes upon the privilege or right to sever natural resources from the soil and are paid by the owner of the resource at the time it is produced. United Gas Pipe Line Co. v. Whitman, 390 So.2d 913 (La.App. 2d Cir.1980), writ denied, 396 So.2d 928 and 396 So.2d 929 (La.1981). Our review of these provisions convinces us that the tax at issue, for purposes of the parties' interpretation and application of the Processing Agreement, is a severance tax levied on the natural gas at the time it is produced or severed from the soil, and that the tax rate is computed, as set forth in La. R.S. 47:633(9), based on the equivalent gas volumes of the natural gasoline and other gas liquids. As such, the 1983 amendment did not change the nature of the tax and did not provide for a separate tax on plant products as asserted by TMC.
Additionally, we note that at the time of the 1983 amendment which forms the basis for TMC's claim, the merger which resulted in TMC's position as producer under the Processing Agreement had not yet occurred. TMC did not succeed to any rights under the Processing Agreement until 1988. There is nothing in the record showing that TMC's predecessor believed *693 that a change in the severance tax law had occurred which would impose a portion of the tax burden on Union Texas or its predecessors. Instead, TMC and its predecessors calculated and paid the tax owed on a monthly basis. The conduct of TMC's predecessors after the 1983 tax amendment establishes the intent of the parties to the Processing Agreement with regard to the division of the tax burden. We find no issue of fact as to TMC's severance tax reimbursement claim and conclude that summary judgment is appropriate.

Compression Charge Claim
Article XV of the Processing Agreement entitled "Low Pressure Gas" provides:
Plant Owner agrees at its sole cost, risk and expense to install facilities to gather and compress low pressure separator gas and stabilizer vapors from the lease described in Exhibit "A" if in Plant Owner's sole judgment the collection of such gas is economically feasible. Should Producer collect and compress and deliver at its sole cost, risk and expense such low pressure gas to the Plant, then Plant Owner shall pay one cent (1¢) per MCF for each stage of compression required to compress the gas to the delivery pressure herein defined. It is agreed that the maximum number of stages of compression required shall not exceed three (3).
TMC contends that it has collected, compressed, and delivered low pressure gas to Union Texas' plant and that Union Texas has failed to pay the compression charge as required in Article XV.
Resolution of this issue turns on the meaning of "low pressure separator gas and stabilizer vapors." The Sligo gas field is a low pressure, low volume field. The full gas stream from the field must be compressed into a pipeline to enter the plant. Two stages of compression are required. The question which arises is whether Article XV sets forth a compression charge applicable to the entirety of the gas compressed into the plant or whether Article XV is limited in its applicability. Oberle stated in his deposition that because the gas is low pressure gas and must be compressed, Union Texas must pay the compression charge. Oberle also stated his understanding of low pressure gas as any gas that must be compressed into a plant; however, Oberle could not explain the meaning of the terms "low pressure separator gas" and "stabilizer vapors" and could not say whether they applied to TMC's claim. However, Oberle did opine that stabilizer vapors are considered "flash gas" or vapors captured from condensate separated from the gas stream. Similarly, John Shroff, TMC's manager of revenue accounting, stated in his deposition that Union Texas owed the compression charge since TMC's gas had to be compressed into the plant. However, Shroff admitted that he had only a general understanding of the gas processing system and no technical understanding of the terms "low pressure separator gas" and "stabilizer vapors."
On behalf of Union Texas, John Watson, a petroleum engineer who went to work for Union Texas Petroleum in 1959, distinguished "low pressure separator gas" from "stabilizer vapors." Watson explained in his deposition that "low pressure separator gas" refers to casinghead gas which is produced from an oil well. When oil is produced from the well, it enters a separator which allows the oil to flow to the bottom and the casinghead gas to enter a low pressure line directed to a gas plant. "Stabilizer vapors," according to Watson, are associated with production from a gas well and consist of the condensate or fluid out of the gas stream. Watson stated that the Sligo field is a gas field and explained that the condensate or fluid was separated from the gas at the wellhead on the lease. The gas was compressed into a high pressure line to enter the plant and the condensate went through a condensate line and into a stabilizer. Watson explained that while he did not participate in the *694 negotiation of the processing agreement at issue, he knew that the low pressure gas clause was a standard clause which originated in West Texas where Union Texas' predecessors had most of its plants and that the clause was generally intended to apply to casinghead gas which was prevalent in West Texas. Watson also explained that the purpose of the clause with regard to the Processing Agreement at issue was to apply to the compression of stabilizer vapors from the gas stream into the plant.
Also relevant to this issue is the fact that Steven Wayne Baker, an employee of TMC, stated in his deposition that, at the time of TMC's merger with CSX, the vapor recovery unit which gathered vapors from the condensate and compressed them for delivery to the plant was no longer in service. Baker stated that the vapors recovered from the condensate were not sufficient to justify operation of the unit.
In granting summary judgment in favor of Union Texas on this issue, the trial court rejected TMC's contention that the gas it supplies to the plant is the type of low pressure gas referred to in Article XV and accepted Watson's explanation that "low pressure separator gas" refers to casinghead gas associated with production from oil wells. We agree with the trial court and find no genuine issue of fact as to this claim. While it is undisputed that the Sligo gas field is a low pressure field and that the gas from the field must be compressed to enter the plant, the record shows that the terms "low pressure separator gas" and "stabilizer vapors" are distinct concepts in the oil and gas industry and that neither term accurately describes the low pressure gas stream generated from the gas wells in the Sligo field. Article XV is entitled "Low Pressure Gas," and it appears to refer to low pressure gas as encompassing "low pressure separator gas and stabilizer vapors." Under Article XV, the plant owner must pay a compression charge if the producer chooses to collect, compress, and deliver "such low pressure gas" at its own cost, risk, and expense. The use of the terms "low pressure gas" and "low pressure separator gas and stabilizer vapors" creates ambiguity as to the applicability of this article. We also note that none of these terms are defined in the Processing Agreement.
To interpret a doubtful provision, we must look to the nature of the contract, equity, usages, and the conduct of the parties. See La. C.C. art. 2053. The Processing Agreement was entered into for the purpose of processing natural gas produced by TMC's predecessors. Under Article III of the agreement, the Producer, meaning TMC and its predecessors, is obligated to deliver for processing the gas produced from the lease and is required to "make all necessary arrangements to deliver the gas to the Plant Owner." The obligation to deliver the gas to the plant can be interpreted to encompass the compression of the gas to a sufficient pressure to enter the plant's system. Also, the placement of Article XV at the end of the agreement indicates that it is in reference to something other than the gas which TMC is obligated to deliver for processing under the agreement. In fact, under Article XV, the plant owner may install facilities to gather and compress low pressure separator gas and stabilizer vapors from the lease if it believes that collection of such gas would be economically feasible. This option flies in the face of the producer's obligation to deliver the gas for processing. The last, and perhaps most important, consideration is the undisputed fact that the course of conduct over thirty years shows that TMC's predecessors have been compressing gas for delivery without seeking to collect compression charges from Union Texas and its predecessors. Upon consideration of the nature of the Processing Agreement, the mutual obligations under the agreement, the deposition testimony submitted by the parties, and the undisputed course of conduct since the confection of the agreement, we conclude that summary judgment in favor of *695 Union Texas is appropriate as to the compression charge claim.

Compression Charge Deduction Claim
This claim arises under the Compression Agreement between Union Texas Petroleum, Union Texas' predecessor, and Texas Gas Exploration Company ("Texas Gas"), TMC's predecessor, on May 27, 1970. This agreement pertains to the compression of the residue gas out of the processing plant and into pipeline of TGT, the purchaser of the residue gas from TMC and its predecessors. The agreement provides that TGT, through a separate agreement with Texas Gas, had previously compressed the gas to enter its pipeline. However, TGT requested Texas Gas to make other arrangements for compression. Texas Gas, through the Compression Agreement, requested Union Texas to compress the gas to a sufficient pressure to enter TGT's pipeline at the tailgate of the plant, and Union Texas agreed. In exchange for Union Texas' compression service, Texas Gas agreed to pay "one and one-half cents per thousand cubic feet of gas compressed for delivery" into TGT's pipeline. This compression charge was to be deducted from the monthly statement paid to Texas Gas under the Processing Agreement.
TMC contends that Union Texas has erroneously charged for volumes of gas compressed and delivered into pipelines other than TGT's and that Union Texas, by the terms of the Compression Agreement, was not entitled to deduct any compression charges on volumes delivered to pipelines other than TGT's. It is undisputed that Union Texas has on occasion compressed TMC's gas for delivery into the pipeline of Mississippi River Transmission Corporation at the outlet of the plant. It is also undisputed that delivery into pipelines other than TGT's was made at the direction of TMC. According to John Shroff, TMC tells Union Texas which pipeline at the tailgate of the plant to direct the residue gas to for sale.
Upon consideration of the undisputed facts and the terms of the Compression Agreement, we find no basis for TMC's claim and no issue of fact which would preclude summary judgment in favor of Union Texas. Union Texas provided a compression service for TMC which facilitated TMC's sale of residue gas at the tailgate of Union Texas' plant. Union Texas received compensation for this service through the deduction of the compression charge on the monthly statements. Nothing in the Compression Agreement prohibits Union Texas from deducting a compression charge for compression and delivery of TMC's residue gas into other pipelines at the tailgate of the plant. The Compression Agreement, by its express terms, was entered into as a result of TGT's request that Texas Gas make other arrangements for compression into its pipeline and is limited to the compression and delivery of gas to TGT's pipeline. The agreement simply does not address compression and delivery of residue gas into other pipelines. Consequently, we cannot say that any compression charge deductions by Union Texas for delivery and compression of residue gas into pipelines other than TGT's was erroneous or prohibited by the Compression Agreement. We find that summary judgment in favor of Union Texas on TMC's compression charge deduction claim is appropriate.

CONCLUSION
For the reasons stated, we affirm the summary judgment in favor of the defendants, Union Texas, et al., dismissing the claims of Total Minatome Corporation at its own cost.
AFFIRMED.
NOTES
[1] According to plaintiff's petition, the same parties also entered a "Marketing Contract" on November 25, 1960. This contract provided for the purchase by Union Texas Natural Gas Corporation, the plant owner, of the producer's share of plant products due to the producer under the Processing Agreement.
[2] According to the record, Arkla Exploration Company ("ARKLA") and the plaintiff are partners in one lease, the "Parcel 3 Lease," in the Sligo field. ARKLA filed suit in 1992 against the same defendants as in the instant suit based on a similar processing agreement. ARKLA's suit raised the same three issues under the processing agreement that have been raised in the instant suit.
[3] TMC indicated at oral arguments that, as of 1992 when a change in its business occurred, it was no longer a party to either the Processing Agreement or the Compression Agreement.
[4] As explained in the record, processing reduces the volume of gas. Reduction occurs through the extraction of plant products from the gas stream, the use of gas as fuel to run the plant, and the shrinkage or loss which naturally occurs through unknown means.