Dear Mr. Comeaux:
The opinion of this office was requested on matters involving the application of the Lafayette City-Parish Consolidated Government Home Rule Charter (the "Charter") to certain Contract Amendments, and in response to a September 7, 2000 opinion of the Louisiana Legislative Auditor issued at the request of the Lafayette City Parish Consolidated Government Council (the "Council"). This office was advised that when the then Parish Attorney differed with the Legislative Auditor's opinion, he was advised by the Legislative Auditor that his opinion could be "reversed by an Attorney General's Opinion or a Court". Accordingly, you requested the opinion of this office.
The facts presented are as follows: in 1995, the City entered into a contract with Waste Management (the "Contract") for solid waste pick-up within the City of Lafayette (the "City"). The Contract provided for a five year initial term ending May 31, 2000, with five successive one year terms unless either party notified the other party in writing of its intention to terminate the Contract not less than 180 days from the expiration of the current term. It also contained an early termination provision in case of impossibility or illegality of performance. The Contract also provided that Waste Management could petition for price adjustments to accommodate increased cost of operations.
The Contract was amended in 1997, which was after the consolidation of the City and the Parish into the Consolidated Government, to eliminate the 1997-1998 Consumer Price Index increase and limiting the ability of Waste Management to increase the price for pass-throughs of increases in disposal costs, among other things (the "First Amendment"). In November, 1999, Waste Management advised the City-Parish that it would opt out of the Contract prior to the December 2, 1999 deadline (180 days before the end of the initial term) unless a price increase was negotiated or the deadline was extended by amendment. On November 23, 1999, the City-Parish and Waste Management entered into an Amendment (the "Second Amendment") whereby the parties agreed that one party could notify the other of their intent to terminate the contract until December 31, 1999.
A third amendment to the Contract (the "Third Amendment") was executed on December 29, 1999. This Third Amendment stated that Waste Management had requested an additional 30 days to determine whether to opt out of the automatic one year extension and, to insure that the City-Parish had sufficient time to negotiate and/or request proposals for collection and disposal of residential solid waste in the event the Contract was not automatically extended, the City-Parish had requested that the Contract be extended until June 30, 2000. The Third Amendment further provided that for the period of June 1 through June 30, 2000, the compensation that Waste Management would receive would be calculated at the same rate to be paid to the party contracting to provide such services for the period beginning July 1, 2000; provided, that in the event any additional or reduced services were included in the rate for services commencing July 1, 2000, then said rate would be adjusted to reflect the same services currently provided. At this time, the rate for residential customers in the City was $8.89 per customer per month.
A fourth amendment to the Contract (the "Fourth Amendment") was executed on January 28, 2000, which extended the date to provide notice of termination until February 29, 2000 and extended the term of the contract to July 31, 2000. It also provided that Waste Management would receive compensation using the same calculations and rates as the party who would provide services beginning August 1, 2000 ; provided, that in the event any additional or reduced services were included in the rate for services commencing August 1, 2000, then said rate would be adjusted to reflect the same services currently provided.
Another amendment to the Contract (the "Fifth Amendment") was executed on February 29, 2000 to extend the notification of termination period until March 30, 2000 and to extend the term until August 31, 2000. It likewise provided that Waste Management would receive compensation using the same calculations and rates as the party who would provide services beginning September 1, 2000, with the same proviso regarding adjustment of the rates.
The Contract was amended yet again (the "Sixth Amendment") to extend the termination notification date until April 30, 2000 and to extend the Contract term until September 30, 2000. This Sixth Amendment contained a similar provision regarding the compensation to be paid Waste Management for the extended period, namely, that Waste Management would receive compensation using the same calculations and rates as the party who would provide services beginning on October 1, 2000, subject to adjustment of the rates.
On April 28, 2000, Waste Management exercised its right to opt out of the Contract.
The Council chose to invite bids from solid waste disposers and the bids were opened on July 18, 2000. Waste Management bid $10.48 per residential unit within the City, while BFI Waste Systems of North America, Inc. ("BFI") bid $11.81 per residential unit within the City. However, BFI's bid for both urban and rural collection was less than Waste Management's bid for the same services.
On August 8, 2000, the Council amended the Code of Ordinances of the Consolidated Government to increase the solid waste fee to be imposed on residences, effective with the first billing cycle of October, 2000 in the City and January , 2001, in the unincorporated areas of the Parish. Also on August 8, 2000, the Council adopted an ordinance authorizing the City-Parish President to execute a contract with BFI for a five year term, beginning October 1, 2000, and amended the Fiscal Year 1999-2000 budget to add $330,000 from the City's General Fund Balance for the cost of providing residential solid waste and disposal services in the City for the month of October and to cover the cost of the new contract.
A seventh amendment to the Contract (the "Seventh Amendment") was entered into as of August 8, 2000, wherein Waste Management agreed that its compensation for the period June 1 through September 30, 2000 would be at the rate of $10.48 per month per customer, which was the amount Waste Management bid on July 18, 2000.
In reviewing the Contract, the Amendments and the Charter, we are governed by the following rules of interpretation as set forth inTotal Minatome Corporation v. Union Texas Products Corp., et al., 33,433 (La.App. 2 Cir. 8/23/00), 766 So.2d 685:
 The following standards for the interpretation of contracts as set forth in McDuffie v. Riverwood Intern. Corp., 27,292 (La.App. 2d Cir.8/23/95), 660 So.2d 158, 160-161, are instructive to our review of the summary judgment in this instance:
 Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. However, when the terms of a written contract are susceptible to more than one interpretation, or where there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, extrinsic evidence is admissible to clarify ambiguity or to show the parties' intent. Doyal v. Pickett, 628 So.2d 184 (La.App. 2d Cir. 1993). Such intent is to be determined in accordance with the plain, ordinary and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable, and fair basis. Lindsey v. Poole, 579 So.2d 1145 (La.App. 2d Cir. 1991), writ denied, 588 So.2d 100 (La. 1991). Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. C.C. art. 2056. However, if doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor. La. C.C. art. 2057.
 One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is performed, particularly if performance has been consistent for period of many years. Spohrer v. Spohrer, 610 So.2d 849 (La.App. 1 st Cir. 1992). Whether a contract is ambiguous is a question of law. Spohrer, supra. However, intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Futch v. Futch, 26,149 (La.App. 2d Cir. 9/23/94), 643 So.2d 364. Where the mutual intention of the parties has not been fairly explicit, the court may consider all pertinent facts and circumstances, including the parties' own conclusions, rather than adhere to a forced meaning of the terms used. Futch, supra.
The following questions are presented:
1. Did the four amendments to the Contract that extended the term four months and allowed for an increase in the rate from $8.89 to $10.48, by virtue of the fifth Amendment that related back to the four Amendments, violate Section 5-06 of the Charter?
Section 5-06 of the Charter provides in pertinent part as follows:
 A. No payment shall be made or obligation incurred against any allotment or appropriation except in accordance with the approved operating budget and capital improvement budget and appropriations duly made and unless the president or the president's designee first certifies that there is a sufficient unencumbered balance in such allotment or appropriation and that sufficient funds therefrom are or will be available to cover the claim or meet the obligation when it becomes due and payable. . . . . . Any authorization of payment or incurring of obligation in violation of the provisions of this charter shall be void and any payment so made illegal; such action shall be cause for removal of any official, officer or employee who knowingly authorized or made such payment or incurred such obligation or who caused such payment to be authorized or made or obligation to be incurred. Such persons shall also be liable to the City-Parish government for any amount so paid. (Emphasis added)
No. Amendments Three, Four, Five and Six, each extended the term of the Contract by one month. These Amendments do not specifically state the amount of compensation to be paid Waste Management, rather each of these Amendments states that the compensation will be determined in the future. There is nothing in the voluminous records which we received which indicates that when Amendments Three, Four, Five or Six were executed anyone knew if Waste Management would be paid more, paid less or paid the same as under the Contract, for the solid waste collection services they performed during the extension period. The amount of compensation to be paid Waste Management was to be determined in the future, once Waste Management and the City decided whether the Contract would continue for an additional one year period. Even though Waste Management had indicated that it wanted a price increase in November, 1999, that doesn't mean that in the event the City went out for bids, Waste Management's competition couldn't bid at or below the amount that Waste Management was receiving. Alternatively, the City could have decided to reduce the level of services to its citizens which would have resulted in reduced compensation to Waste Management. While this may not be politically popular, there is nothing in the Charter which requires a certain level of solid waste disposal services. At the time these four amendments were executed, there was no way for you, Waste Management or anyone else to know the exact impact on the fisc of the City-Parish of the four Amendments. It wasn't until August 8 that the amount due Waste Management was fixed.
It is also our understanding that no additional funds were required to fund the extensions of the Waste Management contract. The amount that was ultimately due Waste Management under the Contract and for the extension period was appropriated, and the budget contained approximately $60,000 above the combined amount due Waste Management. As sufficient funds were appropriated for the Contract, there could be no violation of Section 5-06 of the Charter.
2. If Section 5-06 was violated by the execution of the Amendments, did such violation rise to the level that would constitute "cause" for removal from office of an "elected official"? Or any other person who "knowingly" engaged in the violative conduct?
3. If yes to 1 and 2 above, who is the proper party to enforce the removal provision against the elected official? Any other party? And, does the council have an obligation to enforce, provoke or pursue the removal provision?
Our answer to question 1 pretermits questions 2 and 3.
4. What procedure or process would be used by the party charged with pursuing the enforcement of the removal provision of Section 5-06 against an "elected official"? Against any other person?
We call your attention to Op.Atty.Gen. No. 88-424 wherein this office stated: "Article X, Sections 24, 25, and 26 of the Louisiana Constitution provides that elected officials may be removed from office by impeachment by the Legislature, by suit for removal and by recall election. The enumerated causes for removal by impeachment or by suit are commission or conviction of, a felony, malfeasance or gross misconduct. Article X, Section 25 authorizes the Legislature to provide by law for the removal by suit of any elected official who has committed or who is convicted of the offenses enumerated above. The jurisprudence of the Louisiana courts consistently holds that in the case of elected officers, the constitutional methods of removal from elected office are exclusive.State v. Dunson, 138 La. 131, 70 So. 61 (1915); State v. Bain, 137 La. 308,68 So. 621 (1915); State ex rel Holmes v. Wiltz, 11 La. Ann. 439 (La. 1856).
5. If yes to 1 above, can LCG refuse to pay Waste Management the funds in excess of the original contract price?
Our answer to question one being in the negative, there is no need to answer this question.
6. Is the remedy of requiring the responsible parties to repay any funds paid in violation of Section 5-06 applicable under these circumstances? What party would be responsible to pursue such a remedy? What would be the process or procedure to be used?
Since we find no violation of Section 5-06, there is no requirement for repayment of the funds.
Trusting this adequately responds to your request, we remain
Very truly yours,
 RICHARD P. IEYOUB Attorney General
 By: _____________________________ MARTHA S. HESS Assistant Attorney General
RPI/MSH/dra
xc: Jeff Moss